THE CANAJOHARIE NATIONAL BANK, Respondent, *v.* JOHN F. DIEFENDORF, Appellant.

The holders of negotiable paper are only entitled to the benefit of the rule of the commercial law which forbids its validity being questioned, when they have purchased such paper in good faith, in the usual course of business, before maturity, for full value and without notice of any facts affecting its validity.

The payment of value for negotiable paper is a circumstance to be taken into account with other facts in determining the question of the *bona fides* of the transaction, and, when full value is paid, is entitled to great weight; but that fact is not conclusive where it appears that the paper was obtained from the maker fraudulently, or under such circumstances that the original holder could not have maintained an action thereon, except in the absence of all evidence tending to show notice to, or bad faith on the part of, the purchaser.

The holder may make out his title by presumption until it is impeached by evidence showing the paper had a fraudulent or illegal inception. When this is done he can no longer rest upon presumption, but it is incumbent upon him to show the circumstances under which it came into his possession, and that he has acted in good faith.

Gross carelessness, although not of itself sufficient, as a matter of law, to defeat title in a purchaser for value, constitutes evidence of bad faith.

In an action by plaintiff, a national bank, upon two promissory notes of $1,000 each, it appeared that one H., who was the payee named in the notes, and another person procured them from the defendant by fraud and misrepresentation, and under an agreement that they should be retained in his possession and paid from the receipts of a business to be carried on as partners by said parties. Plaintiff, through its cashier, purchased said notes of H. at its office, nearly 200 miles from the place where the notes were executed. Defendant had for many years lived about six miles from said office; he was a farmer who had never been engaged in any business requiring the discount of negotiable paper to any noticeable extent, and was known to said cashier, who testified that H. was a perfect stranger to him, and he did not know his residence, except that he had said he lived in Colorado. One V. introduced H. to the cashier, stating that he wanted to get some money on the notes. The cashier requested V. to indorse them, but he refused. The cashier made an offer to purchase the notes at a discount much greater than lawful interest, payment to be made in drafts, which offer H. accepted; he gave the cashier no information as to where he might receive notice of protest, or as to his pecuniary circumstances, and no such information was required of him. The cashier did not know defendant's handwriting and had made no inquiries of any one in regard thereto. The

drafts were cashed the next day by plaintiff upon the statement of H. that he preferred the money. *Held,* that it could not be said, as a matter of law, that the notes in suit were acquired in good faith and in the usual course of business; and so, that a refusal to direct a verdict in plaintiff's favor was not error; and that the evidence justified a verdict for defendant.

Plaintiff's cashier, who was its financial agent and owned one-fifth of the stock, testified that he had no knowledge or notice of the consideration for the notes, and that he took them in the usual course of business. The circumstances attending the purchase were also testified to by him, and no contradictory evidence was given by defendant. *Held,* that the cashier's interest in the transaction was co-extensive with plaintiff's, and that, although his testimony was not contradicted, his credibility was a question for the jury.

(Argued June 19, 1890; decided October 7, 1890.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department made March 16, 1889, which reversed a judgment in favor of defendant entered upon a verdict and reversed an order denying a motion for a new trial and granted a new trial.

This action was brought upon two promissory notes executed by defendant.

The facts, so far as material, are stated in the opinion.

*Z. S. Westbrook* for appellant. The notes in question are absolutely void under chapter 65, Laws of 1877, in not having the words " given for a patent right " written or printed upon the face thereof, above the signature, as thereby required, in the hands of any purchaser who is not a *bona fide* holder. (*Spring* v. *Quance,* 3 How. Pr. [N. S.] 65; *Palmer* v. *Minor,* 8 Hun, 342; *Herdic* v. *Roesler,* 109 N. Y. 127; *Barton* v. *C. J., etc., P. R. Co.,* 17 Barb. 397.) The court at General Term erred in holding that as a matter of law the plaintiff was a *bona fide* holder of the notes and entitled, therefore, to recover the amount paid for the same. (1 Randolph on Neg. Paper. 14, § 12; 1 Pars. on Cont. 254; *Stalker* v. *McDonald,* 6 Hill, 93.) The question whether plaintiff was a *bona fide* holder, was properly submitted to the jury. (*Vosburgh* v. *Diefendorf,* 119 N. Y. 357;

*F. N. Bank* v. *Green,* 43 id. 298; *F. & C. N. Bank* v. *Noxon,* 45 id. 762; *G. Bank* v. *Penfield,* 69 id. 502; *Comstock* v. *Hier,* 73 id. 273, 274; *D. S. M. Co.* v. *Best,* 105 id. 59; *Seymour* v. *McKinstry,* 106 id. 240; *Goldsmid* v. *L. C. Bank,* 12 Barb. 407; *Bookstaver* v. *Jayne,* 60 id. 146; Daniels on Neg. Inst. §§ 777, 789, 795, 796, 799, 801; *Williamson* v. *Brown,* 15 N. Y. 354; *Baker* v. *Bliss,* 39 id. 70; *Nutter* v. *Stover,* 48 Me. 163; *Hamilton* v. *Marks,* 52 Mo. 78; *Merritt* v. *Duncan,* 7 Hisk. 156; *Steinhart* v. *Baker,* 34 Barb. 436; *Gould* v. *Stevens,* 43 Vt. 125; 1 Edw. on Bills, § 570; 1 Pars. on Bills, 260; Story on Prom. Notes, § 197; 2 Rand. on Com. Paper, 693, § 999; *Smith* v. *Harlon,* 64 Me. 510; *Craft's Appeal,* 42 Conn. 146; *Austin* v. *Grunner* 90 Ill. 360.) The amount of the shave on purchase of a note, and inadequacy or unreasonableness of price paid for note, is evidence of bad faith, to be submitted to the jury. (2 Rand. on Com. Paper, §§ 991, 992, 1018, 1019, 1020; *Lay* v. *Wissman,* 36 Ia. 305; *De Witt* v. *Perkins,* 22 Wis. 474; *Bailey* v. *Smith,* 14 Ohio St. 396; *Herth* v. *M. N. Bank,* 34 Ind. 380; *Gould* v. *Stevens,* 43 Vt. 125; *Goldsmid* v. *L. C. Bank,* 12 Barb. 410; *Gould* v. *Segee,* 5 Duer. 270; *Taylor* v. *Atchison,* 54 Ill. 196; 13 Ala. 410; 14 id. 688; 16 id. 406; *Ormsbee* v. *How,* 54 Vt. 183; *Murray* v. *Lordner,* 2 Wall. 121.) The plaintiff was bound to prove that he was a *bona fide* holder to the satisfaction of the jury. (*Vosburgh* v. *Diefendorf,* 119 N. Y. 357.) The plaintiff had no legal power to purchase notes. Its violation of the statute creating it, and especially the provisions in regard to taking usury deprived it of the character of a *bona fide* holder. At least the question was for the jury, and bore upon its good faith in the purchase of the notes. (*Logan* v. *N. U. Bank,* 52 Md. 78; *F. N. Bank* v. *Pierson,* 24 Minn. 140; 16 Alb. L. J. 319; 905; 47 Vt. 546; *F. Bank* v. *Baldwin,* 23 Minn. 198; Thompson's Nat. Bank Cases, 637, 639; Brown's Nat. Bank Cases, 261; 1 Randolph on Com. Paper, §§ 331, 332; *N. Y. L. & T. Co.* v. *Helmer,* 77 N. Y. 64; U. S. R. S. § 5136; *Eastman* v. *Shaw,*

65 N. Y. 522.) Plaintiff's good faith rested entirely upon the interested testimony of the cashier Richmond. His credibility was clearly a question for the jury as the trial court properly held. (*Elwood* v. *W. U. T. Co.*, 45 N. Y. 549, 554; *Kavanagh* v. *Wilson*, 70 id. 177, 179; *Sheridan* v. *Mayor, etc.*, 8 Hun, 424; *Gildersleeve* v. *Landon*, 73 id. 609, 610; *Dean* v. *Van Nostrand*, 23 Wkly. Dig. 97; *Longyear* v. *U. S. L. Ins. Co.*, 20 id. 165; *Karney* v. *Mayor, etc.*, 92 id. 617; *Cross* v. *Cross*, 108 id. 628; *Becker* v. *Roch*, 104 id. 394; *People ex rel.* v. *French*, 17 N. Y. S. R. 100; *Moody* v. *Prell*, 2 Abb. [N. C.] 274; *Stillwell* v. *Carpenter*, id. 238; *Hodge* v. *City of Buffalo*, 1 id. 356; *Nicholson* v. *Connor*, 8 Daly, 212; *Honegger* v. *Wettstein*, 94 N. Y. 252, 261; *McNulty* v. *Hurd*, 86 id. 553, 554; *Posthoff* v. *Schreiber*, 47 Hun, 593, 598; *Murray* v. *Lordner*, 2 Wall. 121.) Giving *prima facie* evidence of a fact does not shift the burden of proof. (*Heinman* v. *Heard*, 62 N. Y. 448.) The failure of plaintiff to produce witnesses Henderson, Van Valkenburgh and Vosburgh to testify in its behalf, were strong circumstances against it. (*Brooks* v. *Sterm*, 6 Hun, 516; 15 J. & S. 436; *Bleecker* v. *Johnson*, 69 N. Y. 309.)

*Matthew Hale* for respondent. The trial court erred in denying plaintiff's request to direct a verdict in its favor. (*Kelly* v. *Burroughs*, 102 N. Y. 93–96; 1 Daniels on Neg. Inst. § 779; *Phelan* v. *Moss*, 67 Penn. St. 59; *Bailey* v. *Smith*, 14 Ohio St. 402; *Murray* v. *Lardner*, 2 Wall. 110; *Welch* v. *Sage*, 47 N. Y. 143; *N. Bank* v. *Young*, 41 N. J. Eq. 536, 538; *Hardic* v. *Roessler*, 109 N. Y. 127; *N. Bank* v. *Lewis*, 81 id. 15; *Barnet* v. *N. Bank*, 98 U. S. 555.) The court erred in refusing to charge as requested upon the subject of the burden of proof. (*Richmond* v. *Diefendorf*, 51 Hun, 537, 545; 2 Pars. on Bills & Notes, 280; 1 Daniels on Neg. Inst. § 819; Byles on Bills, 194, 121; Chitty on Bills, 648; *Duncan* v. *Scott*, 1 Camp. 100; *Ress* v. *Marquis*, 2 id. 574; *Patterson* v. *Hardacre*, 4 Taunt. 114; *Thomas* v. *Newton*, 2 C. & P. 606; *Smith* v. *Brain*, 15 Jur. 287; *Bailey* v. *Bidwell*, 13 M. &

W. 73; *Harvey* v. *Towers,* 6 Exch. 654; *Vallett* v. *Parker,*
6 Wend. 615; *Cathie* v. *Hanson,* 1 Duer. 309; *Hart* v.
*Potter,* 4 id. 458; *Ross* v. *Bedell,* 5 id. 462; *Dalrymple* v.
*Hillenbrand,* 62 id. 5; *Cowing* v. *Althnan,* 71 id. 435; *F. N.
Bank* v. *Green,* 43 id. 298; *F. Bank* v. *Noxon,* 45 id. 762;
*O. Bank* v. *Carll,* 55 id. 440; *Wilson* v. *Roche,* 58 id. 642;
*G. Bank* v. *Penfield,* 69 id. 502; *Nickerson* v. *Ruger,* 76 id.
279; *Seymour* v. *McKinstry,* 106 id. 230; *Stewart* v. *Lans-
ing,* 104 U. S. 505; *Smith* v. *Livingston,* 111 Mass. 342;
*Sullivan* v. *Langley,* 120 id. 437; *Kellogg* v. *Curtis,* 69 Me.
212, 214.) The trial court erred in refusing to charge the
jury that if the plaintiff paid Henderson $1,945.75 for the
notes before they became due, it was entitled to recover
the amount so paid by it with interest. (*Chapman* v.
*Rose,* 56 N. Y. 137; *Welch* v. *Sage,* 47 id. 143; *Seybel*
v. *N. C. Bank,* 54 id. 288; *Murray* v. *Lardner,* 2 Wall.
110; *Texas* v. *White,* 7 id. 700, 735; *Hotchkiss* v. *N. Bank,*
21 id. 354, 359; *Collins* v. *Gilbert,* 94 U. S. 753, 754;
*Shaw* v. *R. R. Co.,* 101 id. 557, 564.) The court erred in
submitting to the jury the question as to " what was the con-
dition of the mind of the party who transacted this business
for the bank on the days when the notes were purchased."
(*Seybell Case,* 54 N. Y. 294.) The court erred in refusing to
charge that the fact that plaintiff paid less than their face, after
deducting legal interest, for the notes in question, is no evi-
dence of bad faith on its part. (1 Daniels on Neg. Inst.
§§ 777, 779; *Gould* v. *Segee,* 5 Duer, 260; *Murray* v. *Lard-
ner,* 2 Wall. 110.) The court erred in refusing to charge that
the plaintiff was entitled to recover if it paid for the notes
before due, unless the jury can find from the evidence that it
had notice or knowledge that the notes were given for a
patent right, or obtained fraudulently, or that there was a want
of consideration or a diversion of the notes. (*Welch* v. *Sage,*
47 N. Y. 25.) To sustain this judgment upon the facts dis-
closed would be to reflect most unfavorably upon the value
and security of commercial paper. (*Coddington* v. *Bay,* 20
Johns. 637, 644.)

Ruger, Ch. J.   The evidence tended to prove that Henderson and Van Valkenburgh procured from the defendant at Rochester on December 7, 1886, eight promissory notes of $1,000 each, payable by him to Henderson or bearer, at various times from three to twelve months from date, by fraud and misrepresentation, and under an agreement that they should be retained in the possession of the payee to be paid from the receipts of a business to be carried on as partners by the said parties, and under such circumstances as would not have authorized their payee to enforce them against the maker. Two of these notes were purchased by the plaintiff of Henderson at its banking office in the village of Canajoharie, nearly 200 miles from the place where the notes were executed, on the 9th and 10th days of December, 1886, respectively, and these notes are the subject of this action.   The purchase of the notes by the plaintiff was conducted by its cashier, and the circumstances attending their transfer were not materially different in respect to the notes, except in the fact that the transfer of the second note indicated a larger indebtedness of their maker at the time of the last transaction, than was inferable from the first sale.   The circumstances of the transfer were testified to by the cashier alone, and constituted a part of the plaintiff's affirmative case.   It may be assumed in the further consideration of the case, that such evidence established the fact that the notes were purchased before maturity, and that the plaintiff paid nearly their face value therefor.   The cashier also testified that he had no knowledge or notice of the consideration of the notes, and that he took them for the bank in the usual course of its business.   Other circumstances affecting the purchase appear from the uncontradicted evidence, and are substantially as follows : The defendant was a resident of the town of Root, and had for many years lived about six miles from Canajoharie, where the plaintiff's banking institution was located.   There is no evidence in the case showing his pecuniary condition; but it does appear that he was a farmer upward of sixty years of age, and had never been engaged in any business requiring

the discount of negotiable paper to any noticeable extent. He was known to the cashier of the plaintiff, by whom the purchase was effected, but Henderson, from whom the notes were bought, was, as he says, a "perfect stranger" to him, and he did not know his place of residence, except that he had said at some prior time, that he lived in Colorado. The transaction connected with the purchase of the notes took place in the outer office of the bank and occupied only about ten minutes. One Vosburg, a resident of Canajoharie, introduced Henderson to the cashier, stating that his name was Henderson, and that he wanted to get the money on the note. The cashier requested Vosburg to indorse it, which he declined to do. The cashier then stated what he would give for the notes, payment to be made in drafts, and Henderson assented and the transaction was closed. Henderson indorsed the notes, but it does not appear that he gave any information to the plaintiff as to his residence, the place where he might receive notice of protest, or his pecuniary circumstances, and none was required of him. It did not appear that the cashier was acquainted with the handwriting of Diefendorf, or made inquiry of any one who knew it. The amount of the purchase-price was paid to Henderson in drafts on plaintiff's correspondents in other cities for which a percentage was charged, and these drafts were cashed on the day after they were respectively received by the plaintiff upon the statement by Henderson that he wanted the cash and did not want drafts. There was no haggling about terms in the negotiation; the cashier dictated the price and the funds in which the payment was to be made, and Henderson accepted the offer without demur or hesitation. The notes bore interest and the plaintiff paid Henderson a sum amounting to their face value less a discount which insured the bank from fifteen to eighteen per cent profit upon the transaction. As might naturally have been expected, after the lapse of a short time, Henderson disappeared and has not since been heard from. The notes were apparently for unusual amounts for a farmer in ordinary circumstances to give, and would naturally have excited curiosity

in those who knew him, as to the circumstances under which such an indebtedness was incurred. The plaintiff's cashier, however, studiously refrained from acquiring any information in regard thereto, even such as might be, under many circumstances, desirable for the bank to have. He made no inquiry as to the consideration of these large notes, the influences, which had taken this farmer so far from home, or the circumstances attending their execution. He asked no questions as to the responsibility, employment or associations of his vendor; but, apparently bought the notes upon the security of a single name, evidenced by a signature unfamiliar to him, and indifferent to the manner in which they were obtained, or the responsibility of the person with whom he was contracting. For aught that he knew, his vendor was utterly irresponsible and might have been a man of infamous character, capable of any crime, and able to place himself beyond the reach of criminal process, if circumstances rendered such a precaution necessary or prudent. Even Vosburg refused to approve the responsibility of the parties, although he went to the bank professedly to enable Henderson to get the money on the notes. The notes might have been given for a gambling transaction or for a usurious consideration, and have been uncollectible by their holder, or impaired in value; but the plaintiff took no heed of these circumstances and embarked the funds of the bank in the purchase of questionable obligations from a perfect stranger, in violation of the customary rules which prevail in financial institutions. The note was transferred at a prohibited rate of interest and would have been void for usury within the doctrine of *Hall* v. *Wilson* (16 Barb. 550) in the hands of any other transferee than a national bank. This fact limits the forfeiture to the interest, but does not make the taking of usury by such banks lawful. The history of the negotiation is best described by negatives, and is more significant from what was omitted than what was avowed. (*Stewart* v. *Lansing*, 104 U. S. 510.) Greater caution in avoiding the most natural information could not have been exhibited by the plaintiff if the cashier had known

the notes were obtained by fraud or crime and desired to remain in ignorance of those facts. His conduct indicated something more than negligence. He · exhibited a studious desire to avoid any information which might throw light upon the origin of the notes, or the existence of equities in favor of their maker. Henderson, a "perfect stranger" to the plaintiff, coming red-handed from the perpetration of his fraud, and desiring to realize its fruits, while his confederate kept Diefendorf employed at a distance from his residence, could not have discovered a less scrupulous or more accommodating instrument than this national bank, if he had sought the customary agencies for the negotiation of feloniously acquired securities. Henderson displayed a cautious reticence in recommending the paper he had to dispose of, and the cashier, with a delicacy as novel as it was considerate, appreciated his situation and refrained from putting any questions which might embarrass his vendor in negotiating a successful sale. Without being called upon to make the explanation usually required by banking institutions in respect to the most ordinary transactions of every-day customers, this stranger, it is claimed, walked into a national bank and converted his feloniously acquired property into money, without difficulty or delay. Common prudence, and a decent regard for the rights of those who might be injured by his conduct, required more than this from the least scrupulous of men, and much more it would seem from the managers of a chartered financial institution. Such institutions have no right to advertise the purchase by them of unlawfully-acquired notes, bonds or negotiable paper, without inquiry or question. Neither have they the right to deal in such securities in defiance of the salutary rules regulating the acquisition of title to personal property. It cannot be seriously contended that a business carried on in such a manner is conducted according to the usual and ordinary course of such institutions, within the meaning of those words as used in relation to transfers of personal property. Promissory notes purchased at an usurious and illegal rate of interest before inception, and being void in the hands of their trans-

ferrer, under circumstances so strange and unusual as accompanied this transaction, cannot be said, as matter of law, to have been acquired in good faith, in the usual course of business.

No material question arises in this case as to which party had the burden of proof, as the plaintiff voluntarily assumed that burden in the outset of the trial, and no contradictory proof as to the circumstances attending the transfer of the notes was given by the defendant. The burden of proof to establish this fact, as we shall hereafter see, rested upon the plaintiff, and upon all the evidence the question we think was for the jury to determine.

The claim that the plaintiff's cashier was a disinterested witness, whose testimony must be regarded as controlling if not contradicted, cannot be sustained. Aside from the alleged improbability of his statements, he was the financial agent of the plaintiff and the owner of one-fifth of its capital stock, and aside from his direct interest, responsible to his principal for the care, fidelity and prudence with which he discharged his official duties. His interest in the transaction was co-extensive with that of the plaintiff, and brings him directly within the cases which hold that the credibility of such a witness is a question for the jury to determine. (*Elwood* v. *W. U. T. Co.*, 45 N. Y. 549; *Honegger* v. *Wettstein*, 94 id. 252.) Such evidence is also for the jury where the evidence of the witness shows his conduct to have been unusual, imprudent, and inconsistent with the character which he seeks to maintain as a *bona fide* holder. (*Stilwell* v. *Carpenter*, 2 Abb. [N. C.] 239; *Moody* v. *J'ell*, Id. 275; *Kavanagh* v. *Wilson*, 70 N. Y. 177.)

At the close of the evidence the plaintiff requested the court to direct a verdict for it upon the ground "that upon the undisputed evidence in the case plaintiff purchased the notes before maturity, paid value therefor, and without notice of any facts constituting a defense to the notes." This request was denied and the plaintiff excepted.

The trial court submitted the case to the jury under instruction that if they found the notes were procured from Diefen-

dorf by fraud and under such circumstances as would not entitle the payee thereof to recover against him, then they should consider the further question, whether the plaintiff purchased said notes for value and in good faith, and if it did not, that the defendant was entitled to a verdict. The jury found for the defendant.

Upon appeal, the judgment entered on this verdict was reversed upon questions of law, and a new trial ordered. The ground upon which this result was reached was said to be that there was no evidence of bad faith in the purchase of the notes on the part of the plaintiff, and that the trial court erred in not directing a verdict for the plaintiff. The plaintiff claims that the proof showing it purchased the notes before maturity, paying value therefor, conclusively establishes its character as a *bona fide* holder, and entitles it to recover, in the absence of proof showing that it had notice or knowledge of facts constituting a defense to the action. The plaintiff's contention eliminates the element of good faith from the transaction and assumes that the language "a holder for value," as used in the authorities is satisfied by proof that the notes were purchased before maturity and value paid therefor. We think this contention is contrary to the weight of authority in this state, even if it is not wholly unsupported by it. The payment of value for negotiable paper is a circumstance to be taken into account with other facts, in determining the question of the *bona fides* of the transaction, and when full value is paid, is entitled to great weight. But that fact is never conclusive, except in the absence of evidence tending to show notice or bad faith. Those who seek to secure the advantages which the commercial law confers upon the holders of bank bills or negotiable paper, must bring themselves within the conditions which that law prescribes to establish the character of a *bona fide* holder. They are entitled to the benefits of that rule only when they have purchased such paper in good faith, in the usual course of business, before maturity for full value, and without notice of any facts affecting the

validity of the paper. This has been the law in this state since the case of *Bay* v. *Coddington* (5 Johns. Ch. 54; 20 Johns. 636). The fact that they took the paper before maturity, and paid the full value thereof, in the absence of other facts, undoubtedly affords a presumption of the good faith of the transaction. But where it further appears that such property has been fraudulently or illegally obtained from its owner or maker, and under such circumstances that the person putting it in circulation could not maintain an action thereon, it is incumbent upon the holder in order to succeed to go farther and show the circumstances under which it came into his possession, and that he has acted in good faith in the transaction. What constitutes good faith in such transactions has been the subject of frequent discussion in the books, and while differences of opinion may exist on some points, there is perfect uniformity among them upon the point that a want of good faith in the transaction is fatal to the title of the holder, and that gross carelessness, although not of itself sufficient as a question of law to defeat title, constitutes evidence of bad faith. The requirement of good faith is expressed in the very term by which a holder is protected, and is fundamental in the maintenance of that character. (1 Pars. on Bills & Notes, 258.) It was held in *Seybel* v. *N. C. Bank* (54 N. Y. 288) that gross negligence, though not conclusive, was evidence of bad faith, and impliedly that a verdict of a jury based upon such evidence would be upheld. This doctrine is conceded even by the case of *Goodman* v. *Harvey* (4 Ad. & El. 870) the leading case in England in upholding the rights of the holders of commercial paper.

Justice Swayne, in the case of *Murray* v. *Lardner* (2 Wall. 121), says: "The rule may be said to resolve itself into a question of honesty or dishonesty, for guilty knowledge and willful ignorance alike involve the result of bad faith." Chief Judge Church said, in the case of *Dutchess Co. M. Ins. Co.* v. *Hachfield* (73 N. Y. 228), that "bad faith is predicated upon a variety of circumstances, some of them slight in character, and others of more significance. * * * A per-

fectly upright, honest man might sell a bond which had been stolen, and the explanation might prevent even the taint of wrong on his part, while the explanation, although falling far short of proof of actual guilt, might leave upon the mind an apprehension that he either directly or impliedly connived at the wrong, or, at least, that he was willing to deal in securities and keep his eyes and ears closed so that he should not ascertain the real truth." In the American and English Encyclopædia of Law (Vol. 2, 390) it is said that "to constitute a *bona fide* holder of a note or bill it must be obtained for value before the real or apparent maturity of the paper, and in the due course of business, and in good faith." Numerous authorities are there cited to maintain the doctrine of the text. The late Judge ALLEN, in the case of *Hall* v. *Wilson* (16 Barb. 548), defined the conditions necessary to render a person a *bona fide* holder, within the meaning of the mercantile law, in the following language : "To entitle the holder of negotiable securities which have been fraudulently, feloniously or without consideration obtained and put in circulation, to the benefit of this rule, he must have become such holder, in good faith, for a full and fair consideration, in the usual course of business and without notice of the defect or infirmity in the title." The opinion in respect to each of the conditions mentioned by the judge was supported by numerous authorities, and the case has been repeatedly cited and approved in the subsequent reports of this state. The case seems to be in point. The action there was brought upon a note for $120, made by the defendant and stolen by one Bundy from the maker's desk. Bundy sold the note to one Bigelow for $115 before maturity. Bundy was introduced to Bigelow by another man who told Bigelow that Bundy had been at work for the defendant. It was held that the note, never having been delivered to Bundy, had no inception until Bigelow bought it, and he, having purchased it at an usurious rate of interest, had not acquired it in good faith and in the usual course of business. The defense of usury was not set up; and the fact that usury was taken was regarded only as evidence upon the question of good faith in

the purchase. The rule is also laid down in Daniels on Negotiable Instruments (2d ed. § 819), as taken from plaintiff's brief, that after proof by the defendant that the paper was fraudulently or feloniously procured from him, and "when the holder responds by showing that he did acquire the instrument *bona fide for value in the usual course of business,* while it is current and under circumstances which do not operate as *constructive notice* of the facts which impeach the original validity, the defendant must then prove that he had actual notice of such facts." Clearly, by this rule, the burden of showing that the holder had notice of the facts impeaching the validity of the paper did not fall upon him until the holder had proved that he purchased in good faith for value, and in the usual course of business. So, also, the rule laid down in Chitty on Bills (12 Am. ed. § 648), quoted by the plaintiff, is to the same effect. The author says: "In an action by the indorsee of a bill of exchange, if it appears on the part of defendant that the defendant or a prior party made it under duress, or was defrauded of it, or had only part of its value, the plaintiff must be prepared to prove under what circumstances and for what value he became the holder." Can it be claimed under this rule, if the circumstances showed the holder acquired the paper in bad faith, or by an unusual course of business, that he could recover upon it? Most certainly not; and yet it seems to us that that is just what the plaintiff claims here.

The case of *Vallett* v. *Parker* (6 Wend. 615), also cited by plaintiff, is authority for the defendant's position. Chief Judge SAVAGE there says: "If there are any suspicious circumstances as to the *bona fides* of his (the holder's) possession, and the defendant has a good defense against the payee, then he must show that he paid value for it. For instance, if the note has been lost or stolen, or fraudulently put into circulation, etc., then the plaintiff must show *that he came lawfully and fairly by it,* and paid value for it." (3 Johns. Ch. 260.)

In *F. N. Bank* v. *Green* (43 N. Y. 300) Judge RAPALLO said: "The ground taken at General Term that the burden of

proof was on the defendant, not only to show the defense of duress, but also to impeach the title of the plaintiff as a *bona fide* holder for value, cannot be sustained. If the defendant had been permitted to prove and had proved the defense of duress, the burden would have been thereby thrown upon the plaintiff to prove that it gave value for the note *and the circumstances under which it was received.*" This case is also cited by the learned counsel for the plaintiff to sustain his contention. Upon what theory this is done it is difficult to understand, for if the burden is cast upon the plaintiff, by proof of the illegality of the paper, to show the circumstances under which it was received, this can be for no other reason than to compel it to show whether it received the paper in good faith or not.

We find no authorities holding that this obligation is discharged by simply proving that value was paid for the property. It was said by Chief Judge Church in *O. N. Bank* v. *Carll* (55 N. Y. 441) that "the only point presented for the consideration of this court is, that the plaintiff failed to prove that it was a *bona fide* holder for value of the note upon which the action was brought. The possession of the note was sufficient, *prima facie*, to established this; but when it was proved that the note was given without consideration, and fraudulently put in circulation, it was incumbent upon the plaintiff to prove the fact." In *Nickerson* v. *Ruger* (76 N. Y. 282), the court said : " At the close of the plaintiffs' case they had, by the admission in the answer, proof of Taylor's indorsement, and production of the note, established a *prima facie* case, and, for the time being, their own right to recover and the defendants' liability. But if the facts offered in evidence by the defendants, had been proved, the latter would have established, not merely that the note was without consideration and made for the accommodation of Taylor, but that it was fraudulently put in circulation and diverted from the use intended. It would then have been necessary for the plaintiffs to prove, if they could, that they were *bona fide* holders of the note for value, or fail in the action."

A sufficient number of authorities has been cited to show the uniformity with which the cases in the highest courts of the state hold that upon proof by the defendant that his obligations have been fraudulently or illegally obtained and put in circulation, the person seeking to recover upon them must show not only that he bought before maturity and paid value, but also the circumstances under which he acquired the paper, with the view of enabling the jury to determine whether he acted in good faith or not. It makes no difference in the question presented, whether the plaintiff pursues the orderly course of first presenting and proving his note, relying upon the presumptions of *bona fides*, which accompany the possession of the paper, and delays making proof of the circumstances of his purchase until after the defendant gives evidence of his defense, or as in this case, he makes the proof of such circumstances as part of his affirmative case. The burden of making out good faith is always upon the party asserting his title as a *bona fide* holder in a case where the proof shows that the paper has been fraudulently, feloniously or illegally obtained from its maker or owner. Such a party makes out his title by presumptions, until it is impeached by evidence showing the paper had a fraudulent inception, and when this is done the plaintiff can no longer rest upon the presumptions, but must show affirmatively his good faith.

The question of law involved in this case was considered in the case of *Vosburgh* v. *Diefendorf* (119 N. Y. 357) and there received the unanimous approval of the court. That case involved questions relating to a note procured in a manner similar to those now under discussion, and we might well have rested our decision upon that case, if there had not been some slight difference in the facts and the manner of their presentation, which have been urged upon us in this appeal

The order of the General Term should be reversed and the judgment entered upon the verdict affirmed, with costs.

All concur.

Order reversed and judgment affirmed.