JOHN D. CHEEVER, Respondent, v. THE PITTSBURGH, SHENANGO AND LAKE ERIE RAILROAD COMPANY, Appellant.

*Bills and notes — when the facts require the submission to the jury of the question whether the holder of the paper took it in good faith.*

In an action brought to recover upon notes issued in the aggregate amount of $10,000 by a Pennsylvania railroad corporation, whose president, residing in the city of New York, was authorized by a resolution of its board of directors to use them in the purchase of cars, it appeared that the president directed that the notes be drawn to his private secretary as payee, who indorsed them, and that the president then pledged them with other collateral to secure a loan of $30,000, used for his own purposes, made by a Boston capitalist, to whom at the time he owed some $75,000, not well secured, much of which was overdue and unpaid, and the interest upon which had not been paid as from time to time it had become due; that the president's business was speculative in its character and was chiefly carried on with borrowed capital; that his railroad had undergone many vicissitudes and had only just emerged from a receivership, and that the capitalist, a lawyer of forty years' experience, himself the president of a railroad, without making any inquiry as to the payee and indorser or as to the railroad, loaned the money on the faith of these notes, which were not protested by him at their maturity and were sought to be enforced against the railroad company only after the lapse of some two years or more thereafter.

*Held,* that the facts of this case, the character and appearance of the paper itself, its possession by the railroad company's president, the complete ignoring of the intervening indorser, the lack of inquiry as to the corporation itself, the previous relations between the president and the capitalist, the speculative nature of the former's business, his borrowing of money from the latter for such business, his large existing indebtedness matured and unpaid, the failure of the capitalist under these circumstances to make the simplest and most natural inquiries, the neglect to protest the paper at maturity, and the failure for two years or more thereafter without plausible excuse to ask for payment, should be submitted to the jury upon the question of the good faith of the capitalist in taking the paper.

APPEAL by the defendant, The Pittsburgh, Shenango and Lake Erie Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 10th day of November, 1897, upon the verdict of a jury for $15,626.64 rendered by direction of the court.

The action was brought upon two promissory notes for $5,000 each, of which the following are copies:

"$5,000.00.  GREENVILLE, PA., *Feb'y 24th,* 1888.

"Three months after date the Pittsburgh, Shenango and Lake Erie Railroad Company promises to pay to the order of John T. Bruen five thousand dollars at the American Exchange National Bank, New York City.  Value received.

"THE PITTSBURGH, SHENANGO & LAKE ERIE
RAILROAD COMPANY,

"Attest:  By M. S. FROST, *President.*

"E. S. TEMPLETON,
" *Secretary.*

Indorsed — " JOHN T. BRUEN,
" M. S. FROST & SON."

"$5,000.00.  GREENVILLE, PA., *Feb'y 24th,* 1888.

"Four months after date the Pittsburgh, Shenango and Lake Erie Railroad Company promises to pay to the order of John T. Bruen five thousand dollars at the American Exchange National Bank, New York City.  Value received.

"THE PITTSBURGH, SHENANGO & LAKE ERIE
RAILROAD COMPANY,

"Attest:  By M. S. FROST, *President.*

"E. S. TEMPLETON,
" *Secretary.*

Indorsed:

"Pay to the order of M. S. Frost & Son,
" JOHN T. BRUEN,
" M. S. FROST & SON."

The notes in suit were executed under the following circumstances: On the 17th day of February, 1888, the board of directors of the railroad company held a meeting at Greenville, Pa., and adopted the following resolution:

" *Resolved,* That the president be and is hereby authorized to make a contract for the purchase of fifty flat cars for the use of this company, and is authorized in carrying out this purpose to give the notes of this company in the sum of $10,000."

After the meeting, and on the same day, M. S. Frost, the president of the company, requested the secretary to prepare the notes

authorized by the resolution. The secretary then asked the president from whom he would purchase the flat cars as authorized by the resolution. The president replied that he did not know and directed the secretary to make the notes in blank. To this the secretary objected and the president said : " Make the notes payable to my private secretary, Mr. Bruen, and when I find from whom I will get the cars I can have him indorse them." The president lived in New York; his office was in New York, and John T. Bruen was employed in that office.

The secretary of the railroad company then prepared the notes in accordance with the president's direction, and delivered them to him. Neither the notes, nor any part of the proceeds thereof, were used in the purchase of the cars.

Subsequent to the making of the notes, and in March, 1888, the president induced Bruen to indorse them (without consideration), by leading him to believe that they were to take the place of a note of M. S. Frost & Son for $10,000, upon which Bruen was indorser, and which was held by the East Bridgewater Savings Bank in Massachusetts. Frost then took the notes to Boston and there pledged them for his own personal purposes with Francis A. Brooks. There was no dispute at the trial as to Frost's fraudulent diversion of the paper. The question was whether Brooks took the notes from Frost as a *bona fide* purchaser for value. The trial judge held, as matter of law, that he did, and directed a verdict for the plaintiff. He refused, upon the defendant's request, to submit the question of Brooks' good faith to the jury, and the defendant excepted to such refusal.

This is the second trial of the case. Upon the first trial the court ruled that Brooks was put upon inquiry by what appeared upon the face of the notes, and a verdict for the defendant was directed. This was affirmed at the General Term (*Cheever* v. *Pittsburgh, etc., R. R. Co.,* 72 Hun, 380), but was reversed in the Court of Appeals (150 N. Y. 59), the latter court holding that the appearances upon the face of the paper were not of themselves sufficient to warrant the direction as matter of law. Other facts appear in the opinion.

*Frank Sullivan Smith,* for the appellant.

*Austen G. Fox,* for the respondent.

BARRETT, J. :

The facts as they appear in the present record differ materially from those which were presented upon the previous trial. We have examined the record of that trial, and we find that the defendant, after proving the diversion of the notes, rested upon the constructive notice implied from what appeared upon their face. It is true that Mr. Brooks' deposition, taken in the year 1891, was read in evidence. But the circumstances attendant upon his receipt of the two notes in suit, as collateral security for the loan which he made to Frost in March, 1888, were not fully or clearly developed. In that deposition Mr. Brooks testified that he lent $30,000 to Mr. Frost upon the security of these notes, together with certificates or receipts representing unissued bonds of the Pittsburgh, Shenango and Lake Erie Railroad Company of the par value of $21,000. These bonds were worth about eighty-five cents upon the dollar. He also testified that he had previously made loans to Frost upon the security of stock of the St. Paul Gas Light Company. He gave no particulars of these other loans, nor did he furnish any information as to their extent, character or condition. He did not intimate that they were large, nor that they were due and unpaid when Frost asked for this fresh loan of $30,000. In fact, there was nothing in his narration on that head suggestive of anything unusual in his financial relations with Frost. For aught that appeared in that deposition, Frost approached Mr. Brooks upon the occasion in question as an ordinary borrower in good credit, who had promptly met his previous obligations at maturity, and whose request for a further loan was unaccompanied by any circumstances calculated to arouse suspicion or to call for special inquiry.

Upon the trial now under review, however, it was proved that at the very time when Frost asked for this additional loan of $30,000, he owed Brooks $75,000; that Frost, as he himself says, was borrowing money from Brooks "all the time;" that he commenced this constant borrowing as far back as the year 1885; that the $75,000 was made up in part of two notes amounting to $17,500, which had matured in the previous month and had not been paid; and that the balance consisted of demand notes which were also unpaid. How this indebtedness of $75,000 was secured does not appear by direct evidence. The inferences deducible from the course of busi-

ness between the parties, however, indicate that it certainly was not well secured. For it appears that the principal debt was never paid, nor was the interest paid as it became due from time to time. This debt, with accrued interest, was "settled or canceled" some two years later by the turning over to Brooks (*as owner*) of the securities which up to that time he had held as collateral thereto.

It seems that Brooks, notwithstanding this unsatisfactory condition of things, unhesitatingly advanced to Frost the further sum of $30,000 without asking a single question or saying a single word as to these unpaid notes. Clearly he did not make the fresh advance to reduce the existing indebtedness. No part of it was applied to the payment of the $17,500 of matured and unpaid notes, much less to the payment of the demand notes. Frost says that when the $30,000 was borrowed, no mention was made of these unpaid notes to his recollection ; and Brooks is entirely silent upon the subject. In fact, there is not a suggestion in the testimony that this indebtedness of $75,000 was then referred to in any manner. There is no proof in this record that the relations of the parties were such as to entitle Frost to special and extraordinary credit — regardless of his large unpaid indebtedness. On the contrary, it appears that Frost's business, apart from his railroad presidency, was largely speculative, and that the capital which he was using in this business was "chiefly borrowed." Bruen testified that Frost's business was the "putting in gas plants," the furnishing of railroad supplies, and "a variety of speculations." It may reasonably be assumed that Brooks knew the nature of Frost's business and was well aware of its unstable and speculative character. Why then did not Brooks scrutinize the securities which such a debtor under such circumstances offered him ? The debtor was seeking to extend his unpaid indebtedness and to extend it largely. What was there in Frost's situation and attitude, when he thus approached Brooks, to warrant the latter in taking anything in the way of security which was offered him; and in taking it without the slightest inquiry ? He knew that Frost was president of the railroad company, and he also knew that that president proposed to raise money for his own purposes upon the credit of the railroad company's notes and securities. The indorsement of Bruen upon these notes played literally no part in the transaction. Upon the present trial, Brooks

himself says so. " I have no idea," he now testifies, " that I placed any value upon the indorsement of John T. Bruen. * * *. I did not, as far as I can recollect, inquire who John T. Bruen was. * * * I did not make any inquiry as to whether he was a man of property. * * * I did not know what interest, if any, the payee named in the notes, John T. Bruen, had had in them " (the notes). This is, under the circumstances, an extraordinary confession. Why, it may well be asked, did he make no such inquiry? Was security for a fresh loan of $30,000, beyond the unpaid $75,000, of so little moment to him that he did not care who the indorser was? Or, for that matter, who the maker was? For there is not an intimation that Brooks made any inquiry even with regard to the railroad or as to its responsibility and solvency. Brooks was himself a railroad president. He had been such for nearly ten years; and he either knew from his general information, as a railroad official, that this particular company had just emerged from a receivership and that its predecessors had undergone great vicissitudes, or else he knew nothing at all about it and did not care to know. Here was a gentleman in Boston, a lawyer of forty years' experience, president of a railroad company and apparently a capitalist, advancing money to a weak and speculative debtor without the slightest scrutiny of the collaterals offered. The parties were neither relatives nor apparently close friends nor near neighbors. There was plainly nothing philanthropic in the transaction. Nor were the securities on their face speakingly convincing. No innocent inference can well be drawn from the possibilities of local knowledge or environment. The debtor was from New York; the railroad was a Pennsylvania corporation; and the indorser Bruen was wholly unknown. He was, in fact, but a name. He might have as well been called John Doe. And Brooks did not even ask where notice of protest should be sent in case the notes should happen to be dishonored. All he knew, or seemingly cared to know, was that his crippled debtor was president of a railroad; that that president had the railroad's notes and securities of uncertain value in his possession; and that he was anxious to pledge these notes and securities to raise money for use in his own speculative adventures.

What happened *subsequently tends to indicate Francis Brooks' consciousness of what the transaction really meant.* The notes

were dated at Greenville, Pennsylvania, and they were payable to the American Exchange National Bank in this city. When they matured they were not protested, nor were they even presented for payment. No notice of non-payment was ever given to Bruen. And what, upon any presumption of innocence, is still more astonishing, payment was not asked from the railroad company for some two years thereafter. The secretary of the company testified that he "first learned of the existence of these notes after their execution *along in 1890 or 1891,* * * * *a short time before the bringing of the suit.*" Now what is the excuse that Brooks gives for thus releasing the indorser Bruen and making no demand upon the railroad company, maker? He says that it was an "oversight." "In the multiplicity of cares," he adds, "I failed to remember the time of their maturity, and when the subject was brought to my attention I found that the time of maturity had passed." But what of that? Why did he not, at least, ask the company for his money? The fact that the time of maturity had passed did not release the maker. Did his multiplicity of cares extend over the entire period of two years? He vouchsafes no answer and suggests no explanation. Might not the jury, had they been permitted by the learned trial justice to consider the case, have found, as a reasonable explanation of Mr. Brooks' inaction, that *he knew all along what the company's answer would be.* The jury might well have absolved this old and experienced lawyer and railroad president from his self-accusation of oversight in so important a matter. They might have said that the shadow which was thrown backward by his non-action was that of consciousness, not of neglect.

It is difficult to see upon what principle, in view of all the present facts, the learned trial justice took the question of good faith from the jury. Certainly he was not admonished to do so by anything in the opinion of the Court of Appeals upon the first appeal. Judge O'BRIEN expressly limits his conclusion to the error of the first trial justice in directing a verdict for the defendant. "There was nothing," he observed, "on the face of the paper or in the facts shown to warrant the court in holding, *as matter of law,* as it did, that the obligations were received by Brooks and the advances made on them *mala fide*" (*Cheever* v. *Pittsburgh, etc., R. R. Co.,* 150 N.

Y. 69). The reasoning of the learned judge throughout is aimed at the direction below. There is not an intimation that, even upon the facts as they then appeared, it would have been erroneous to submit the question of good faith to the jury.

As we have seen, however, the facts are now, in many important particulars, much stronger in support of the charge of bad faith than they were in the former record. Facts which then seemed innocent, standing alone, are now colored and darkened by the additional facts to which we have referred. And these additional facts have also an independent bearing upon the question of good faith. It was conceded in the Court of Appeals that, but for the intervention of Bruen's name, a case of *mala fides*, as matter of law, would have been made out. (Citing and approving *Wilson* v. *M. E. R. Co.*, 120 N. Y. 145, and many other cases.) What was held was that the intervention of Bruen's name, in the absence of any independent circumstance suggestive of bad faith, relieved Brooks from the conclusive imputation of *mala fides as matter of law.* It was not held, however, or intimated that this intervention conclusively relieved him from the imputation of bad faith as matter of fact, nor that it operated to take from the jury the consideration of all the attendant circumstances on that head. There is, indeed, nothing in the opinion which requires us to hold that the appearances which, but for the intervention of Bruen's name, would have concluded Brooks, as matter of law, should be entirely eliminated from consideration when the question of good or bad faith is presented for decision as matter of fact. We think all the facts bearing upon that question were for the jury; the character and appearance of the paper upon its face; its possession by the railroad company's president; the complete ignoring of the intervening indorser, Bruen; the lack of inquiry, even as to the corporation itself, as to its bonds; the previous relations between Frost and Brooks; the speculative nature of the former's business; his constant borrowing of money from Brooks for use in that business; his large existing indebtedness to Brooks matured and unpaid; the failure, under the circumstances, to make the simplest and most natural inquiries; the neglect to present or protest the paper at maturity, and the failure for years thereafter, without plausible excuse, to ask for payment.

We think these facts, and others to which we need not specially

advert, were quite as sufficient to carry the case to the jury as were the facts in *C. N. Bank* v. *Diefendorf* (123 N. Y. 191). The Court of Appeals, in that case, dwelt upon quite analogous facts, and treated them as essentially suggestive of bad faith. One of those facts was, that the seller of the notes gave the cashier of the purchaser bank no information as to his residence or pecuniary circumstances, or to the place where he *might receive notice of protest.* Chief Judge Ruger spoke of the circumstances attendant upon the purchase of the notes as follows : " The plaintiff's cashier, however, studiously refrained from acquiring any information in regard thereto, even such as might be, under many circumstances, desirable for the bank to have. He made no inquiry as to the consideration of these large notes, the influences which had taken this farmer so far from home, or the circumstances attending their execution. He asked no questions as to the responsibility, employment or associations of his vendor, but apparently bought the notes upon the security of a single name, evidenced by a signature unfamiliar to him, and indifferent to the manner in which they were obtained, or the responsibility of the person with whom he was contracting." And again : " The history of the negotiation is *best described by negatives,* and is more significant *from what was omitted than what was avowed.* (*Stewart* v. *Lansing,* 104 U. S. 510.) *Greater caution in avoiding the most natural information* could not have been exhibited by the plaintiff if the cashier had known the notes were obtained by fraud or crime, and *desired to remain in ignorance of those facts.* His conduct indicated something more than negligence. He *exhibited a studious desire to avoid any information which might throw light* upon the origin of the notes, or the existence of equities in favor of their maker." The rule was laid down in this case, and there applied to the facts, that " gross carelessness, although not of itself sufficient as a question of law to defeat title, *constitutes evidence of bad faith.* \* \* \* It was held in *Seybel* v. *N. C. Bank* (54 N. Y. 288) that gross negligence, though not conclusive, was *evidence of bad faith* and impliedly *that a verdict of a jury based upon such evidence would be upheld.*"

" Guilty knowledge and *willful ignorance,*" said Justice Swayne in *Murray* v. *Lardner* (2 Wall. 121), " *alike* involve the result of bad faith."

Mr. Daniel states the rule succinctly in another way as follows (Daniel Neg. Inst. § 796b): " *The circumstances of the transaction* may be of such a character as to intimate strongly a defect in the title, and if they are such as to invite inquiry they will suffice, provided *the jury* think that abstinence from inquiry arose from a belief or suspicion that inquiry would disclose a vice in the paper. * * * But further than this, gross negligence, which is not in itself proof of *mala fides*, may be so great as to amount to proof of notice." And the learned writer quotes Baron PARKE's observation in *May* v. *Chapman* (16 M. & W. 355) : " I agree that notice and knowledge mean not merely express notice, but knowledge or the means of knowledge to which the party willfully shuts his eyes."

The authorities also support the appellant's contention, that the question, upon the present facts, was for the jury. In *Vosburgh* v. *Diefendorf* (119 N. Y. 357) Judge O'BRIEN, speaking for the Court of Appeals, reaffirmed the doctrine of the courts of this State, that where the maker of negotiable paper shows that it has been obtained from him by fraud, a subsequent transferee must, before he is entitled to recover thereon, *show that he is a bona fide purchaser.* " The plaintiff," said that learned judge, " did not meet the requirements of this rule, for he remained silent upon the subject of notice of the circumstances under which the maker gave the note." After going over the facts carefully, he added : " The most favorable view that could have been taken of the case for the plaintiff *would still require the question of his good faith to be passed upon by the jury.*"

Even where the evidence is not conclusive, *if it tends to establish* the lack of good faith it should be submitted to the jury ; and the jury are authorized to draw such inference from the facts proved as any reasonable view thereof will permit. (*Hanover Bank* v. *American Dock & Trust Co.*, 148 N. Y. 619.)

This doctrine seems to be conclusive of the present appeal without regard to the incidents of the trial as to the order of proof. The defendant here does not question the testimony of either Brooks or Frost. It does not ask us to discredit their testimony. It takes their testimony just as the witnesses gave it. But from that testimony, from its affirmations, its negatives and its omissions, from the attendant circumstances which it partially discloses, and from the inferences which may fairly be deduced therefrom, the defendant con-

tends that the question of Brooks' good faith should at least have been submitted to the jury. We are satisfied that it is right in this contention; and that the learned trial justice's direction cannot be sustained.

The judgment should, therefore, be reversed, and a new trial ordered, with costs to the appellant to abide event.

VAN BRUNT, P. J., RUMSEY and McLAUGHLIN, JJ., concurred.

PATTERSON, J.:

The question here is whether there was something more in the evidence on behalf of the defendant than mere suspicions of the good faith of Francis Brooks in taking the notes from Frost. A careful examination of the record induces the conclusion that a jury might be justified in finding that Mr. Brooks' relations to Frost were such that, as a lender of money, he was put upon inquiry as to the nature and character of the security offered as collateral to so large a loan. I am, therefore, inclined to concur in the conclusion that the special circumstances of this case were such that it should have gone to the jury.

Judgment reversed, new trial ordered, costs to appellant to abide event.