HAUSS v. LAKE ERIE & W. R. CO.

(Circuit Court of Appeals, Sixth Circuit. January 14, 1901.)

No. 831.

1. EMPLOYERS—DUTY TO EMPLOYE.

A railroad company which is constructing new switches does not owe the duty to a brakeman of blocking a frog, which is a part of the new construction, during progress of the work; it being impracticable to block it till the tracks are ballasted and the alignment of the rails of the frog is perfected. Giving him such notice and warning as will put him on his guard against the dangers from use of the track while the work is in progress is enough.

2. SAME—NOTICE.

Notice to a brakeman that digging is being done between the ties at a certain place, with warning that he look out for it and avoid injury, is sufficient, without mentioning the danger from the unblocked frogs, especially where the work has been for two weeks within his daily view and observation while passing on his train.

3. WITNESS—CREDIBILITY—QUESTION FOR JURY.

Though, in an action against a railroad for death of a brakeman, the only direct evidence that notice of the danger was given deceased is the testimony of the conductor, whose duty it was to bring the bulletin in regard to it to the knowledge of the trainmen, his credibility is not for the jury, on the ground of his interest to show that he had done his duty; his testimony not being contradicted or brought in question by cross-examination or the admitted facts, and there being nothing else in the case tending to raise a doubt as to the truth of his testimony.

In Error to the Circuit Court of the United States for the Northern District of Ohio.

The evidence shows that on the 10th day of June, 1898, at Muncie, Ind., the plaintiff's intestate, William V. Doty, a brakeman in the defendant's service, while coupling cars, received injuries of which he died within a few hours. At the time of his death he was in the twenty-fourth year of his age, and had been in the service of the defendant, as a brakeman, for about 18 months. He was employed on a freight train which passed daily over defendant's railroad between Tipton, Ind., and Lima, Ohio; and on the day of the accident his train came east, with eight cars, for Muncie, which were to be detached from the train and left at that place. For 10 days or 2 weeks next before the accident the defendant had been constructing two new switches near the place of the accident, and on that day the work was still in progress. Just before the arrival of Doty's train, several cars carrying gravel to ballast the new tracks had been unloaded near the place of the accident, and were standing on a storage track, on which the Muncie cars from Doty's train were to be placed, and it being necessary to move them out of the way, the cars from Doty's train were backed in, to be coupled to them; and while the cars from Doty's train were backing, and while Doty was walking inside of the track behind them, keeping pace with their movement, his right foot was caught and held in an unblocked frog until they backed over him, causing the injuries of which he died. It was the usage and practice of the defendant to keep the frogs in its line of railroad blocked, but this particular frog was a part of the new construction, and had not been blocked because it was not practicable to block it until the tracks were ballasted and the alignment of the rails of the new switches with the alignment of the rails of the frog was perfected. The accident occurred about 11 o'clock of the forenoon, and the day was bright and clear, and there was nothing to obstruct the view of the track. During the 10 days or 2 weeks during which the new construction had been in progress, Doty passed by it daily, going east and west with his train. A bulletin which reads as follows:

| "Sent to | Time Sent | Sender | Receiver |
|---|---|---|---|
| Po | | | n |
| pd | 7:37 p. m. | B | Tn |
| Gx | | n | Gy |
| | From | 5|30th | 1898. |

To all Cond Rd
    All Trains East Gx
        West Po

"Digging is being done between ties around Muncie yard office, and quarter mile west of yard office. Look out for it, and don't get injured.

                                                        S. R. K."

—was put on the train register in the yard office at Muncie, to which all trainmen had access, and it remained there until the work was completed. The conductor of Doty's train testified in chief concerning this bulletin as follows: "Q. Explain to the court and jury how those bulletins were handled, with relation to trainmen? A. They manifolded, eight or ten taken on manifold paper at a time; and each train going through Muncie, the conductor got them and showed them to the trainmen, to all concerned in the matter, to look out for new work being done at Muncie. Q. I will ask you if you received a copy of this message, which is marked 'Exhibit No. 2,' at Portland on the 9th, and also at Alexandria on the 10th? A. Yes, sir; that is a copy of it. Q. What is meant by 'Gx'? A. The station at Alexandria. Q. And 'Po'? A. Portland. Q. 'S. R. K.'? A. S. R. Kramer. Q. What did you do with this bulletin after you got it, so far as Mr. Doty was concerned? A. I told Mr. Doty about it, and showed it to him. He read it and handed it back to me. Q. Which one? A. The one at Portland, going west, and the one at Alexandria, going east. Q. You showed him the one at Portland on the 9th? A. Yes, sir. Q. And the one going east on the 10th at Alexandria? A. Yes, sir. Q. How often during the continuance of this work were these bulletins handed to trainmen? A. Every train that went in either direction, every day and night, as the case might be." And on cross-examination further testified: "Q. You knew that this bulletin you had did not say anything about unblocked frogs, but to look out for digging that was being done at Muncie? A. Yes, sir. Q. That was the only bulletin you had, was it? A. Yes, sir." Upon this state of fact, the plaintiff complained that the injuries of which Doty died were caused by the negligence of the defendant in failing to block the frog in which his foot was caught, in accordance with its established usage and practice. But the defendant contended that, as it was neither usual nor practicable to block the frog during the progress of the work, it owed no duty to Doty in respect thereto, other than to notify him that the work was being done, and to warn him of the danger incident to the use of the track while it was in progress, and alleged that it did so notify and warn him, and that his injuries, therefore, were not caused by any fault on its part. On the trial before a jury at the close of the evidence the trial judge sustained the contention of the defendant, and directed a verdict in its favor.

Henry W. Seney, for plaintiff in error.

Charles T. Lewis, for defendant in error.

Before DAY and SEVERENS, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge, after stating the case as above, delivered the opinion of the court.

We agree with the learned judge who presided at the trial in the court below that the defendant was not required to block the frog during the progress of the construction, and that the only duty which it owed to the plaintiff's intestate, under the circumstances presented by the evidence, was to give him such notice and warning as would

put him upon his guard against the dangers incident to the use of the track while the work was in progress. It is urged, however, that the notice was insufficient because it failed to call attention to danger from unblocked frogs. It did call particular attention to the track, and to what was being done there. · It is true, there was no attempt to point out all the possible or probable elements of danger which might arise out of the changes being made in the track, but the trainmen were required to look to the track and avoid being injured because of the work being done there. This was sufficient notice, especially in view of the fact that what was being done there was within the daily view and observation of Doty as his train passed through Muncie.

The only direct evidence of notice to Doty was the testimony of Jeffries, the conductor of the train; and it is suggested here, for the first time in the progress of the case, that his credibility as a witness was put in issue by his relation to the parties and to the subject-matter of the controversy, and that the cause should have been submitted to the jury upon that issue. The suggestion is that the witness, as an employé of the defendant, whose duty it was to bring the bulletin concerning the work at Muncie to the knowledge of the trainmen, had an interest in showing that he had performed the duty, and strong motive to falsely represent that he had done so, if in fact he had not performed the duty, and that this interest and possible motive raised a question as to his credibility, which should have been considered by the jury. The testimony of the witness was not contradicted by that of any other witness, nor was it brought in question by the cross-examination nor by the admitted facts of the case; and, outside of the suggested interest and motive, there is not a fact or circumstance in the case which tends to raise a doubt as to the truth of his testimony. It is said in Elwood v. Telegraph Co., 45 N. Y. 554, that:

"Very clear and decisive evidence was required in this case to establish that the message which came over the defendant's wires was not communicated in the natural and ordinary manner. From the necessity of the case, such evidence as there is to that effect proceeds wholly from parties having an important interest in the question. Each of them, if guilty of the negligent act, would have the strongest motive to deny it, as the admission would subject him or her to severe responsibility for the consequences. This is a controlling consideration in determining whether the statements of these witnesses should be taken as conclusive."

But in that case the admitted facts necessarily raised the question of the credibility of the witnesses. A telegram had been received at Pithole over the wires of the telegraph company, and delivered by the company's agent at Pithole as coming from Titusville. The telegraph company denied sending it from Titusville, and the operators at the Titusville office testified that it was not sent by them from that office, and the court say that:

"The only theory by which the testimony of the operators is sought to be reconciled with the conceded fact of the receipt of the message at Pithole over the defendant's wires is that the wires were cut by McCarthy, or a confederate, at some intermediate point, and a machine there applied, whereby the message was transmitted. And it is claimed that the court was bound to solve the difficulty by presuming that this was actually done, rather than

to permit the jury to pass upon the credibility or accuracy of recollection of the witnesses."

In Hankinson v. Electric Co., 175 Mass. 271, 56 N. E. 604, decided February 28, 1900, brought to recover damages for personal injuries occasioned the plaintiff by being struck in the eye by a burnt carbon thrown by one Bayrd, who was in the defendant's employ, Bayrd testified:

"I did not throw it at the team for any purpose connected with my business, but to attract his attention. I wanted to attract his attention, so as to speak to him; and I threw the carbon at the team, so as to attract his attention, so that I might speak to him, and not for any business connected with the company."

The defendant contended that there was no evidence on which the jury could find that the carbon was thrown by Bayrd for the purpose of performing the work of the defendant, but the court say:

"When the defendant's liability depends upon the purpose with which an act that is nearly neutral, so far as outward manifestations are concerned, is done, it would be strange if the jury were not at liberty to disbelieve the testimony of one employed by the defendant as to his mental processes. In that connection it was proper for the jury to take into consideration the fact that not only was this witness at the time of the trial in the employ of the defendant, but also that he had been taken back into its employ only two weeks before the trial; and the jury may have also believed that, from the terms in which his testimony was couched, it was evident that the witness had a particular knowledge of what the law required to exonerate the defendant from liability. We are of opinion that it was a question for the jury whether the explanation given by Bayrd of the purpose he had in throwing the disused carbon was true or not."

The impeaching circumstances in that case, outside of the mere fact that the witness was in the employ of the defendant, justified its submission to the jury.

In Bank v. Deifendorf, 123 N. Y. 200, 25 N. E. 404, the court say:

"The claim that the plaintiff's cashier was a disinterested witness, whose testimony must be regarded as controlling if not contradicted, cannot be sustained. Aside from the alleged improbability of his statements, he was the financial agent of the plaintiff, and the owner of one-fifth of its capital stock, and, aside from his direct interest, responsible to his principal for the care, fidelity, and prudence with which he discharged his official duties. His interest in the transaction was co-extensive with that of the plaintiff, and brings him directly within the cases which hold that the credibility of such a witness is a question for the jury to determine."

In these cases there were not only impeaching circumstances which necessarily raised the question of credibility, but it was insisted upon by the party interested. In the case at bar the question was neither made nor in any way suggested by the plaintiff or his counsel at the trial, nor do the facts and circumstances of the case justify an impeaching presumption against the credibility of the witness, founded upon his mere relation to the parties and to the subject-matter of the controversy, which should overcome the counter presumption that, as an uncontradicted witness, testifying under oath, he spoke the truth. The judgment of the court below therefore will be affirmed.