## SUPREME COURT.

### Florence M. De Meli agt. Henry A. De Meli.

*Code of Civil Procedure, sections 1762, 1763, 1769, 3230—Action for separation by husband or wife—For what causes may be maintained—Cruel and inhuman treatment which will authorize a separation—What constitutes a person a resident of this state—Expenses of action and costs, how awarded.*

The residence of a man is changed from one place to another only by an abandonment of his first place of domicile with the intention not to return, and by taking up his residence in another place with the intention to permanently settle in that place.

Where it appeared from defendant's own testimony that, during all the time of his sojourn in Dresden, whenever he has had occasion to state his residence he has described himself as a resident of the city of New York; that he has every year paid the stranger's tax in the city of Dresden; that all the property he expects to inherit is situated in the city of New York:

*Held,* that from his own evidence he has never had any intention of obtaining a residence anywhere else than in the city of his birth, and was consequently a resident of the state of New York at the time of the commencement of this action.

Cruel and inhuman treatment which will authorize a separation, or which will permit a wife to say that it is unsafe or improper for her to cohabit with her husband, must be either actual personal violence, committed with danger to life, limb or health, or there must be a reasonable apprehension of personal violence, arising from menaces or threats creating a reasonable fear of bodily harm; mere austerity of temper, petulence of manners, rudeness of language, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty.

While the treatment of the plaintiff by the defendant was frequently unkind, while he frequently indulged in fits of passion and used violent language, and by his conduct, supervision and attempts to control her

De Meli agt. De Meli.

every action, made himself, at times, very disagreeable to her, and frequently caused her great unhappiness; while he was severe, harsh and even ungentlemanly, yet his conduct was not such as to create any apprehension of personal violence, or to cause injury to the health of the plaintiff, and for that reason she is not entitled to a decree for a separation.

That defendant made an unfounded charge of adultery against plaintiff while she was living separate from him, and which only came to her notice indirectly, is not such an act of cruelty as to warrant a separation. Nor does the making of a charge of adultery, even to one's wife, constitute cruelty, unless such charge be made in bad faith, and without any ground for believing it to be true.

Where in an action brought by the wife against her husband to obtain a separation from him, and he sets up a counter-claim and alleges that his wife was guilty of adultery, and such allegation was made as a foundation for a claim for a demand for affirmative relief, and not simply as a defense to plaintiff's action:

*Held*, that this was tantamount to the commencement of an action by him against his wife for divorce on the ground of adultery, and as to that counter-claim she has the same right as though she were defendant in an action brought against her for an absolute divorce, and although her complaint be dismissed, yet where she succeeds n refuting the charge of adultery, she is entitled to an allowance for her counsel fees and expenses of preparing for trial *pendente lite*.

*Special Term, April,* 1884.

*John E. Parsons,* for plaintiff.

*H. B. Turner* and *David McClure,* for defendant.

RUMSEY, *J.* — The plaintiff brings this action under section 1762 of the Code of Civil Procedure, to obtain a separation from the defendant.

The first answer of the defendant attacks the jurisdiction of the court; and he claims that, under the facts as they appear, he was not, at the time of the commencement of the action, a resident of the state of New York, as required by section 1763, subdivision 1, and that for that reason the court has not obtained jurisdiction. From evidence in the case, it appears that the defendant was born in the city of New York, in the year 1842; that his father was a naturalized

citizen of the United States; that he was educated at the School of Mines, in Columbia College; and that, after he had finished the course at that school, he went to Dresden with his father and mother, where, except for some months, when he has been in the United States or in South Africa, he has since staid. It appears from his own testimony that during all the time of his sojourn in Dresden, whenever he has had occasion to state his residence, he has described himself as a resident of the city of New York; that he has every year paid the stranger's tax in the city of Dresden; that all the property he expects to inherit is situated in the city of New York; and it is quite clear, I think, from his own evidence, that he has never had any intention of obtaining a residence anywhere else than in the city of his birth; such being the case, he has never acquired a residence away from this state, because the residence of a man is changed from one place to another only by an abandonment of his first place of domicile with the intention not to return, and by taking up his residence in another place with the intention to permanently settle in that place (*Frost* agt. *Brisbin*, 19 *Wend.*, 11; *Lowry* agt. *Bradley*, 39 *Am. Dec.* 142; *Dupuy* agt. *Wurtz*, 53 *N. Y.*, 556, 561).

It is conceded that the plaintiff was, at the time of the commencement of the action, a resident of this state, and I am quite clear, therefore, that she has brought herself within subdivision 1 of section 1763 of the Code, and that the court has jurisdiction of the action.

The plaintiff claims that she is entitled to a separation, because, as she says, for a long series of years the defendant has been guilty of cruel and inhuman treatment of her, and has conducted himself in such a manner as to render it unsafe and improper for her to cohabit with him as his wife. It appears from the evidence that the parties were married at Dresden, on the 1st day of March, 1870; that soon after their marriage they came to this country and went to Georgetown, in the state of Colorado, where they resided for some months,

and then, at the request of the plaintiff, they left Georgetown and returned to Europe, that the plaintiff might be near her mother at the time of the birth of her first child, which took place in the latter part of October, 1870. The plaintiff, upon her examination, stated several instances of unkind and ungentlemanly treatment, which she claimed to have received from the defendant while they were in New York on their way to Georgetown, and while they were living in Georgetown. It is unnecessary to refer particularly to those incidents. They were not pleasant, it is true, and it is just as true that, if the plaintiff's version of them is correct, the defendant did not treat her with the kindness with which a husband should treat his wife  Of themselves they have little importance; whatever importance they do have, is derived simply from the fact that they are *indicia*, which enables us to get an idea of the manner of man the defendant was, and his notions of how a wife ought to be treated.

The plaintiff's charges against her husband are, in the first place, that he gave way to terrifying outbursts of temper towards her, which were aggravated by his becoming addicted to excessive indulgence in strong drink, from which he would become greatly excited. I do not think the evidence shows that the defendant was at any time addicted to excessive indulgence in strong drink; so far as the plaintiff's case depends upon that, it is entirely disproved by the evidence. That he did give way to outbursts of temper, and that he was, when about his house, harsh, and at times severe in his treatment of the plaintiff, is not to be denied. From the time he left Georgetown, it appears by the evidence that he was wholly without employment, except during the few months which he spent in South Africa. A large portion of his time was spent in his apartments, and he seemed to be a man who had his own ideas of how his house should be managed, which were frequently different from the ideas of his wife on that subject; and it appears that he very frequently interfered with the servants and with his wife's management of the

De Meli agt. De Meli.

household affairs, and with his wife's disposition of her own time, and that he required her to conform strictly to his notions in regard to all her household matters, and to obey implicitly every wish that he expressed. I am inclined to think, from the evidence, that his behavior in his family was properly characterized by one of the witnesses as "petty tyranny," and I have no doubt that there were times during the married life of these people when this behavior was the cause of great unhappiness to the plaintiff. But the evidence does not show that his outbursts of temper were accompanied by any personal violence towards the plaintiff, or that she had any apprehension or fear of receiving personal violence at his hands. In fact, she says explicitly, in her testimony, both on her direct and on her cross-examination, that she never had any "apprehension or alarm" of personal violence at his hands, until six weeks before she left Dresden; and there does not appear anywhere in the case any action on his part, either an outburst of ill-temper or even a quarrel with his wife, during that period of six weeks before the plaintiff left Dresden, which could possibly have given rise to any apprehension or alarm. In fact, the whole case, from beginning to end, is wonderfully barren of any treatment on the part of the defendant toward the plaintiff which could give rise to any such apprehension. Some of the witnesses say that his behavior was brutal; the plaintiff says that certain acts of which she complains were cruel, but they fail to specify any acts which may be legally characterized as cruel or brutal. The plaintiff complains of the treatment of her parents by the defendant, and I think it is fair to say, from the evidence, that the defendant was not at all times inclined to be upon friendly terms with them; but there appears in evidence only one case when, even upon plaintiff's own testimony, the defendant was guilty of anything which could properly be called gross abuse of her parents, or outrageous behavior toward them. The explanation which he gives of the refusal to admit Mr. Draper to the house at the time when his wife

De Meli agt. De Meli.

was lying ill, was not contradicted, and it seems to me that it is correct, and it was reasonable. I think that the version of the plaintiff as to the treatment of her parents is somewhat exaggerated in her testimony, but I am sure that it is quite clear, from the evidence, that the defendant did not have any friendly feeling toward Mrs. Draper, and that he prevented, as far as possible, any intercourse between her and her daughter. He gave the reasons which led him to this course during the time Mrs. Draper was at Freibourg. I was not much struck with their force, and the impression which the evidence left upon my mind as to the treatment of Mrs. Draper, was that the defendant treated her unkindly and in an ungentlemanly manner; and this, I have no doubt, was the cause of very considerable unhappiness to the plaintiff.

The plaintiff complains, further, that the defendant treated with great severity and harshness their boy, a child of about six years; that he used to punish him unmercifully for slight causes, and that at one time when she endeavored to stand between him and the child she received upon her person the blows which were intended for the child; and she says that this punishment of the child was asserted by the defendant to have been inflicted for the purpose of hurting her feelings, because it was the most convenient way for him to make her uncomfortable and to treat her cruelly. The plaintiff says that this course of treatment of the child commenced when the child was of the age of six years, and continued down to the time when she left the defendant's house. There is other evidence in the case tending to show that the defendant was in the habit of punishing the child quite severely, and there is the evidence of Minna Moehring that at one time, when she was passing along the corridor, she saw the defendant strike the boy with a book and with his fists, and knock him down. I do not think, however, that the allegations and assertions of the plaintiff are borne out by the evidence in the case. She herself stated that when the boy needed punishment she very frequently took him to the defendant to be punished, and

stood by while the punishment was being inflicted ; and that, it seems to me, is quite inconsistent with her statement that the defendant was in the habit of punishing the child severely for no other purpose than to inflict pain upon the mother.

I cannot conceive it to be possible that a mother, knowing that her husband was in the habit of wantonly inflicting severe beatings upon her child, would take the child to the father and request him to punish it. Especially is this so when she knows that the beatings are inflicted for the express purpose of hurting her feelings.

It does not appear that the act which is related by the witness Moehring ever came to the notice of the plaintiff, and the story she tells is entirely without any statement of the circumstances, and I do not feel at liberty to attach much weight to it. I have no doubt that the defendant did punish the child, and punished him severely, at times, but the evidence does not show that such punishment was more severe than the good of the child required, and it entirely fails to show, in my judgment, that it was inflicted at any time for the purpose of giving pain to the mother.

The plaintiff also complains of the conduct of the defendant's mother toward her. I do not see that that has any importance in this case. They never lived in the same apartments or in the same house, or even in the same street. It does not appear that the defendant compelled his wife to be in the company of the elder Mrs. de Meli when she was not inclined to do so, except that he desired her to go with the rest of the family to his mother's to dinner on Sunday afternoons, and it does not appear that she expressed any serious disinclination to do so, or that she was compelled to do so when she felt inclined to refuse. It may be quite true that there was, on the 1st of October, 1881, a serious quarrel between the plaintiff and the elder Mrs. de Meli ; and it is very possible that the defendant was inclined to take his mother's part; but I do not see that, upon the testimony of the plaintiff herself, the defendant took any active part in the quarrel or inter-

De Meli agt. De Meli.

fered in it in any way; but she herself says that after that time, when she refused to go to the house of the elder Mrs. de Meli to dinner, because of the treatment she had received from her, the defendant interposed no objection to her staying away, and she did stay away.

As to the purpose of the defendant to place the plaintiff in a lunatic asylum, or a "*maison de sante*," I think the evidence of Dr. Zumpe is quite conclusive to the effect that no such suggestion was ever made to him, and I do not think that the defendant ever had any intention of taking any such step, although the conversation which was had between the plaintiff and the defendant in regard to Mrs. Von Weber may have given her the idea that he had such an intention; and that is the more likely from the fact that at that time the plaintiff was not at all well, and was still suffering from the fatigue of moving and the nervous excitement caused by her quarrel with the elder Mrs. de Meli.

I have thus gone over substantially all the charges upon which the plaintiff claims that she is entitled to a separation, except the charge of adultery, which I will consider later.

The right of a court to grant a separation is based entirely upon the statute, and unless the plaintiff brings herself, by a fair preponderance of the evidence, within the statute as it has been interpreted by the courts, she can have no separation, however unpleasant her relation with her husband may have been, or however unhappy a life has come to her from those relations. The interpretation of this statute is not — in this state, at least — an open question. It is thoroughly well settled that cruel and inhuman treatment which will authorize a separation, or which will permit a wife to say that it is unsafe or improper for her to cohabit with her husband, must be either actual personal violence, committed with danger to life, limb or health, or there must be a reasonable apprehension of personal violence, arising from menaces or threats creating a reasonable fear of bodily harm; and the mere austerity of temper, petulance of manners, rudeness of language, even

occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty (*Mason* agt. *Mason*, 1 *Ed. Ch. R.*, 278, 292; *Bishop on Marriage and Div.* [*4th ed.*], sec. 717, *et seq., and notes; Kennedy* agt. *Kennedy*, 73 *N. Y.*, 369, 374).

As is said by lord SEWELL, in the case of *Evans* agt. *Evans* (1 *Hag.*, 35): " These things are high moral offenses in the marriage state, undoubtedly — not innocent, surely, in any state of life — but still they are not that cruelty against which the law can relieve. Under such misconduct of either of the parties — for it may exist on one side as well as on the other — the suffering party must bear in some degree the consequences of an injudicious connection — must subdue by decent resistance or by prudent conciliation; and if this cannot be done, both must suffer in silence. And if it be complained that by this inactivity of the courts much injustice may be suffered and much misery be produced, the answer is that courts of justice do not pretend to furnish cures for all the miseries of human life. They redress or punish gross violations of duty, but they go no further. They cannot make men virtuous, and, as the happiness of the world depends upon its virtue, there may be much unhappiness in it which human laws cannot undertake to remove."

The plaintiff here, as we have seen, charges no personal violence, and it appears that she never had any apprehension of personal violence at the hands of the defendant. Admitting this, she claims that she is entitled to this separation because the conduct of the defendant was such as seriously and injuriously to affect her health, and therefore rendered it unsafe and improper for her to cohabit with him. To sustain her claim that such conduct entitles the injured party to a separation, she cites the case of *Kelly* agt. *Kelly* (*L. R.*, 2 *P. & D.*, 31, 59). It appeared in that case that the respondent adopted a deliberate system of conduct to his wife, with a view of bending her to his authority; he entirely deposed her from her natural position as mistress of her husband's house;

she was debarred the use of money, the household expenses were withdrawn from her control, and she was not permitted to spend any money for her own necessary expenses; every trifle that she required had to be put down on paper, and her husband provided it if he thought proper; having, on one occasion, declined to tell her husband, on her return from town, every house to which she had been, an interdict was placed on her going out at will; at one time the doors were locked to keep her in; at another time a man servant was deputed to follow her; and at another time the respondent himself insisted on going with her wherever she wanted to go. On all occasions he occupied the short time they were together in applying to her strong, coarse and abusive epithets, " and language that would be applicable to a woman who had been guilty of adultery." He passed no time in her society; he took no meals with her, and whenever he spoke to her it was only to reproach her. Save on two occasion she was not permitted to see anybody. She was prohibited from writing letters to any friend, unless her husband saw them. And the effect of this treatment, as found by the court, was that her health was so broken down that to continue subject to the same treatment for any length of time, would not only have seriously imperiled her life, but would have exposed her to the highly probable consequence of paralysis or madness. Upon that state of facts the court of probate and divorce held : " If force, whether physical or moral, is systematically exerted to compel the submission of a wife in such a manner, to such a degree and during such a length of time as to injure her health and to render a serious malady imminent, it is legal cruelty, and she will be entitled to a judicial separation."

The case was a very strong one, and it is perfectly clear, as the court found, that the treatment complained of had already broken plaintiff's health, and that a longer continuance of it would produce irreparable injury. The facts brought that case within the rule laid down in *Kennedy* agt. *Kennedy* (*supra*), for the wife was actually locked in and deprived of

her liberty. But it need not to be put upon the ground that the husband used actual physical violence to the wife. It was enough that the treatment of the wife was such as to break down her health. But between the cases at bar and that of *Kelly* agt. *Kelly*, there is a vast difference. It arises from the fact that it is apparent upon the plaintiff's own case. In delivering the opinion in *Kelly* agt. *Kelly*, the judge ordinary, lord PENZANCE, says: "It behooves the court to be sedulous in inquiry and slow in conviction. It should be entirely satisfied that the conclusion of the wife's danger is clearly reached, and on reliable evidence," and the whole gist of the decision is that it was admitted that the conduct of the respondent was such as to be attended with serious injury to the health of his wife. Now, in the case at bar, there is no evidence that the conduct of the defendant toward his wife was attended with any injury whatever to the health of the plaintiff. Indeed, it does not appear that she was at all out of health down to April, 1881. No doctor testifies to it. Not one of her witnesses suggests it, although several of them speak of his ill treatment of her, and that she was in tears.

During all her married life, and down to the time when the defendant returned from South Africa, she was able to attend to her household duties and to the social duties required by her position, and not one of her friends, who were examined as witnesses in her behalf, testifies to any failure of her health, for any reason whatever, during all those years, until the admitted failure of her health in the summer of 1881.

She herself testifies, upon her direct examination, that at the time the defendant left for South Africa, in September, 1880, her health was "perfectly good — perfectly well," so far as she could remember. Although she finally says she was somewhat unstrung at the time he left, such facts surely do not establish an injury to health to require a separation. It is true that her health failed to some extent after his return from South Africa, but there is nothing in the case to show

that such failure should be attributed to the conduct of the defendant toward her.

The plaintiff says there was no other cause for that failure than his violent treatment of herself and children. But I have searched the evidence in vain for the facts to warrant that conclusion. Ill treatment of the kind claimed, so violent. and persistent as to break down plaintiff's health between April and June (when it began to be suggested that her health required her to go to Frazensbad), would surely have been noticed by others, and would have been accompanied by some act or word which would have burned itself into the memory so that she could relate it. But there is nothing of the kind; the case stands upon her declaration that there was no other cause for her illness than his violent treatment; she specifies no act, she relates no incident, she says " there was nothing unusual;" "it was violent and it completely unnerved me again; I was very miserable." This will not do. Sympathy for a suffering woman must not blind us to the requirements of the law that "the conclusion of the wife's danger shall be clearly reached and on reliable evidence." The plaintiff's mere opinion will not support such a conclusion, and I could not be justified in finding as a fact that the conduct of the defendant towards the plaintiff was attended with injury to her health.

I have thus far assumed that the conduct of the defendant was substantially as claimed on the part of the plaintiff, and that her life was constantly unhappy by reason of his treatment. It is only fair to say that upon the evidence of her own letters, it is not entirely clear that she has not considerably exaggerated the unhappiness which she felt. These letters, from the beginning to the end of them, whether written to her husband or to other people, were all written after the commencement of this treatment towards her which has been characterized as " petty tyranny;" but they show a warmth of affection which it seems to me it would be impossible for her to entertain if the conduct of the defendant

toward her had been uniformly such as she now states that it has been, and especially is that true of the letters written to him during his absence in South Africa.

The conclusion which I have reached, upon the evidence, as to the treatment of the plaintiff by the defendant during the years in which they lived together, is that while it was frequently unkind, while he frequently indulged in fits of passion and used violent language, and by his constant supervision and attempts to control her every action, made himself at times very disagreeable to her, and frequently caused her great unhappiness; while he was severe, harsh and even ungentlemanly, yet his conduct was not such as to create any apprehension of personal violence or to cause injury to the health of the plaintiff, and for that reason she is not entitled to a decree for a separation.

In addition to the reasons for a separation, given in the former part of this decision, the plaintiff insists that she is entitled to such a decree, because the defendant, after she left him in October, 1881, made an unfounded charge of adultery against her. There is no claim that any such charge was ever made or suggested during the time the parties lived together as man and wife. It appears from the evidence that whatever charge of that nature was made, was made by de Meli in regard to his wife after she had ceased to live with him, and after certain information had come to him from Mrs. Von Geyso, and from his little daughter. This charge of adultery was not only made by the defendant against the plaintiff, but he insists upon it in this action, and attempts to prove it, and he bases upon it a claim that he should have an absolute divorce from his wife. It has come to be a settled doctrine in this state that a false and malicious charge of adultery, made by a man to his wife, in her presence, may be such an act of cruelty as to entitle her to a separation ( *Whispell* agt. *Whispell,* 4 *Barb.,* 217; *Kennedy* agt. *Kennedy,* 73 *N. Y.,* 369). But the principle upon which this doctrine is based is that such a charge, if it be false and malicious, made to a

virtuous woman, inflicts such an injury upon her feelings as would warrant her in refusing to live with any man who would be guilty of it. The cruelty consists in the injury to the feelings caused by the false and malicious charge made to the person of whom it is spoken. I have found no case in which it has been held that such a charge, made of a woman while she was living separate from her husband, and which only came to her notice indirectly, was a sufficient act of cruelty to warrant a separation, and I am not prepared to accede to that proposition, but, however this may be, the making of a charge of adultery, even to one's wife, does not constitute cruelty, unless such charge be made in bad faith, and without any ground for believing it to be true. As is said by judge Church in *Kennedy* agt. *Kennedy* (*supra*), "if a husband has reason to suspect his wife of infidelity, it is neither cruel nor inhuman to charge her with it."

Considerable evidence was given in this action which the defendant claimed tended to show that the plaintiff was guilty of adultery with Baron Von Geyso and, unexplained and uncontradicted, it seems to me that such evidence was such as, to say the least, warranted a reasonable man in thinking that the charge might have been true, and warranted him in doing what he did do, which was to consult his own friends and the friends of his wife with regard to the matter, and to ask them what it was best to do in the premises. Upon the evidence, it would be absurd to say that there was nothing to sustain the charges of adultery; and I do not think it can be said, under the circumstances, that they were made either maliciously or in bad faith. But upon the whole case it is very clear to me that the charges were not sustained, and that the plaintiff was not guilty of the adultery which was alleged against her.

The defendant insists that when the plaintiff went away on the 12th of October, 1881, she abandoned him, and that, therefore, he is entitled to a separation. I think his own evidence shows that there was an understanding between

them that the plaintiff might go away upon giving him two days' notice. He swears that that was said, and Mrs. de Meli, in her letter of the twelfth of October, in which she notifies him of her departure, apologizes to him for not giving him notice, which it is said he was to have. As he consented to her departure, I do not think he is in a condition to complain of it now.

The plaintiff insists that it is evident that she cannot again live with her husband, and, as a separation is inevitable, the court should award it.

The reasons for which a limited divorce may be granted are found in the statute (*Code Civil Pro, sec.* 1762). Unless the plaintiff establishes one of the grounds specified in that section she can have no relief; that the parties cannot live together is not one of those reasons (*Davis* agt. *Davis*, 1 *Hun*, 444).

These considerations dispose of all the claims made by the respective parties, and lead to a dismissal of the complaint. I have been very much puzzled with the question of costs. Ordinarily, there is no doubt of the rule that a party who fails in this action is chargeable with costs; and if the only question in this case was whether Mrs. de Meli was entitled to separation, I should have no hesitation in dismissing the complaint without costs, which, of course, would not be granted against the wife here; but that is not all the questions litigated between these parties. As the Code now stands the defendant might, if he saw fit, set up a counter-claim in which he might allege any cause for a divorce or separation which is given by the Code and insist upon affirmative relief.

This was tantamount to the commencement of an action by him against his wife for divorce on the ground of adultery, as to that counter-claim she has the same right as though she were defendant in an action brought against her for an abso-lute divorce; that she is entitled to an allowance for her counsel fees, expenses of preparing for trial *pendente lite*. If she had finally succeeded in an action for an absolute divorce

De Meli agt. De Meli.

brought against her, her right to costs would have been unquestionable.

In this case the defendant saw fit to allege that his wife was guilty of adultery, and that was a serious question which was tried in the case, to which by far the larger portion of the testimony of the defendant was directed. This allegation was made as a foundation for a claim for a demand for affirmative relief, and not simply as a defense to plaintiff's action, as it might have been. It was by all odds the most important question litigated in the case; and the great portion of the expenses of the trial of the case on the part of the plaintiff has arisen from the necessity she was under of meeting and rebutting this charge of adultery. While, therefore, her complaint has been dismissed, she has not entirely failed in her action; on the contrary, she has succeeded in by far the more important issue which was presented.

Had an application for an allowance for expenses to meet this charge been made by the plaintiff before trial, I cannot doubt it would have been granted as though she were defendant in such action. As she has succeeded in that part of her litigation, I think she should still be treated as though she were defendant. The Code (*sec.* 1769) especially allows the court in such cases to award costs in its discretion to either party, and the rule in this, as in all other equitable actions, is to give costs as equity requires.

I think that this woman, who has been called upon here to defend her honor, and has done it, should be put in the same situation, so far as the issue is concerned, as though she had been defendant in an action in which that were the sole question tried and had succeeded.

For these reasons I am inclined, in the discretion which is given to the court by sections 1769 and 3230 of the Code, to give to the plaintiff such costs as will repay her as far as possible for additional expense to which she has been put, by reason of the necessity of preparing to meet the charge of adultery, which has been made against her. I do this the

more willingly because it appears that no allowance has been made to her for alimony or counsel fees during the pendency of the action. I think the taxable costs of the action and an allowance of $500 for counsel fees would be sufficient to repay her for the additional expense of preparing to meet the charge of adultery, and that amount, I think, should be allowed to her.