FIRST DEPARTMENT, JANUARY TERM, 1894.　　　[Vol. 75.

MAYER GOLDSMITH, Respondent, *v.* WILLIAM COVERLY, Appellant, Impleaded, etc.

*Action on contract — burden of proof — uncontradicted testimony of a party or officer of a corporate party — the question of his credibility is for the jury.*

In an action upon a contract the burden of proof necessarily rests upon the plaintiff to establish a compliance on his part with the provisions thereon, upon which he bases his claim of right to recover.

The testimony of disinterested witnesses who are neither impeached nor discredited must be credited, but the testimony of witnesses who are parties to the action must ordinarily be considered by the jury, in order that they may determine what effect, if any, their interest in the result of the controversy should have upon their credibility, and although the testimony of a party to an action be uncontradicted, his interest presents a question as to credibility which the jury must pass upon; where a corporation is a party to an action, the same rule applies to the testimony of its officers.

APPEAL by the defendant, William Coverly, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the city and county of New York on the 26th day of June, 1893, upon the verdict of a jury directed by the court after a trial at the New York Circuit.

*Austen G. Fox,* for the appellant.

*Wilhelmus Mynderse,* for the respondent.

PARKER, J.:

The agents in New York for the National Steamship Line, the Wilson Line and the Anchor Line of steamers, about May 18, 1887, made an agreement with the plaintiff, which was reduced to writing in the form of a communication signed by the agents, and accepted by the plaintiff, which reads as follows:

"NEW YORK, *May* 18, 1887.

"DEAR SIR.— Please note that on October 1st, 1887, we will severally return to you a sum equal to five (5) per cent of the aggregate freights you may pay us from April 1st to July 1st, 1887, on live cattle shipments to Glasgow, Liverpool, London or Hull, England.

"That on January 1st, 1888, we will return to you a like per-

centage of the aggregate freights which you may pay us on such shipments from July 1st to October 1st, 1887.

" That on April 1st, 1888, we will return to you a like percentage of the aggregate freights which you may pay us on such shipments from October 1st, 1887, to January 1st, 1888.

" That on July 1st, 1888, we will return to you a like percentage of the aggregate freights which you may pay us on such shipments from January 1st to April 1st, 1888.

" Provided, that any and all live cattle in the export of which, from this port to Glasgow, Liverpool, London or Hull, you may be interested, directly or indirectly, shall have been shipped exclusively, for the six months preceding each of said dates of payment on steamers represented by the undersigned.

" Respectfully yours,

" F. W. J. HURST,
" HENDERSON BROTHERS,
" SANDERSON & SON."

This agreement was continued orally by the plaintiff and Henderson Bros., defendants in this case, from the 1st day of April, 1888, to January 1, 1890.

The defendants, in the meantime, made for the plaintiff large shipments of cattle, receiving payment therefor. But from December 31, 1888, to January 1, 1890, they did not pay to the plaintiff anything on account of rebates, and refused to do so, for the reason, as they alleged, that plaintiff had failed to comply with the conditions upon which the right of rebate was made to depend, in that he had not shipped all live cattle in which he was directly or indirectly interested from the port of New York to the ports named in the agreement by the steamship lines agreed upon.

It was to recover the amount of such rebates that induced the commencement of this action. There was no dispute as to the amounts of freights paid defendants, and the only issue presented by the pleadings was whether plaintiff had conformed to the agreement by shipping live cattle to the ports designated in it by the steamship lines represented by the agents signing it. The burden of proof necessarily rested upon the plaintiff to establish a compliance on his part with that provision of the agreement upon which he based his claim of right to recover.

The only evidence presented by him for that purpose was his own testimony, which, if true, was sufficient to require a verdict in his favor. The court, assuming it to be true, directed a verdict in his behalf for the sum of $7,088.77. The defendants, having asked for leave to go to the jury on the issues presented, now contend that it was error for the court to direct a verdict against them, and the reason assigned is that, in view of the fact that the only evidence offered in support of plaintiff's claim was that of a party to the action, whose testimony it is urged was to some extent discredited by his own answers on cross-examination, the question as to the truthfulness of his evidence was for the jury.

That the court could direct the jury to find a verdict in favor of plaintiff in the event that they should believe his testimony to be true, but that it had no right to direct them to believe him. The early rule denied the competency of a party to the record to testify as a witness.

Subsequently this rule was changed by statute, which has since become incorporated in the Code of Civil Procedure (§ 828). But ever since parties to an action were qualified by statute to testify as witnesses in their own behalf, a distinction has been uniformly observed between their testimony and that of wholly disinterested witnesses. While the testimony of disinterested witnesses who are neither impeached nor discredited must be credited, that of witnesses who are parties to the action, by reason of their interest in the result, is ordinarily to be considered by a jury, in order that they may determine what effect, if any, their interest in the result of the controversy should have upon their credibility.

And it has been held many times that, although the testimony of a party to an action be uncontradicted, his interest presents a question as to credibility, which the jury must pass upon. (*Honegger* v. *Wettstein*, 94 N. Y. 252–261; *Wohlfahrt* v. *Beckert*, 92 id. 490–494; *Kavanagh* v. *Wilson*, 70 id. 177; *Elwood* v. *W. U. Tel. Co.*, 45 id. 549; *Sheridan* v. *The Mayor*, 8 Hun, 424; *Moody* v. *Pell*, 2 Abb. N. C. 274.)

In actions where corporations are parties the same rule has been applied to the testimony of its officers. (*Canajoharie Bank* v. *Diefendorf*, 123 N. Y. 191–200; *Joy* v. *Diefendorf*, 130 id. 6.)

The case which tends more strongly to support the decision made

than any other is *Kelly* v. *Burroughs* (102 N. Y. 93). In that case the defendant was the first and plaintiff the second indorser on a note made by one Evans. From the statement of facts we quote : " Defendant then testified that he indorsed the note at the request and for the accommodation of Evans, the maker, and returned it to him ; that the plaintiff procured the note to be discounted, had the money placed to his own credit, and on the same day drew the money. The plaintiff then testified that he indorsed the note and procured it to be discounted at the request of the maker, and gave the proceeds to him. Other evidence was given to the same effect." It is apparent, therefore, that to some extent, at least, the plaintiff was corroborated. How fully the report of the case does not inform us, but it appears from the statement of the case that it was in substantial respects. The court held there was no question for the jury, saying, the " mere fact that the plaintiff, who testified to important particulars, was interested, was unimportant, in view of the fact that there was no conflict in the evidence, or any thing or circumstance from which an inference against the fact testified to by him could be drawn."

It will be observed that neither in the statement of facts nor in the opinion of the court does it appear that plaintiff's recovery was based solely upon testimony given by himself.

But if we assume that the fact was otherwise, and that the authority of *Kelly's* case has not been impaired by the later decisions in *Bank* v. *Diefendorf* and *Joy* v. *Diefendorf* (*supra*), the conclusion is nevertheless required that the defendant was entitled to go to the jury, for in this case the testimony elicited from the plaintiff on his direct and cross-examination was of such a nature that, considered in connection with the fact that he was a party to the action, the question of his credibility became one for the jury to pass upon.

The defendants relied, whether wisely or not is of no moment in the present discussion, upon the plaintiff's testimony and his books and papers covering the period in dispute, to show that he had failed to keep his part of the agreement not to ship cattle to the ports named therein by other than the agreed steamship lines. In order that the books and papers should be made available for such purpose on the trial the plaintiff was duly subpœnaed to produce such of them as covered the period from December 31, 1888, to January 1, 1890.

He did not produce them, assigning as a reason that the books were lost or destroyed and the bookkeeper dead.

We quote from his cross-examination some of the answers made by him to inquiries with reference to them : " Q. And you have no books back of 1891 ?  A. No.  Q. Where were the books which covered this period as to which we are all interested, when you saw them last ?  A. I can't remember.  Q. What is the name of your bookkeeper ?  A. That man I had at that time is dead now ; he died last year. It is not quite twelve months since he died ; I guess it is about — I can't remember exactly, nine or ten months. His name was Michael Epstein.  Q. How many books do you think there were that related to your business, covering this period in question when you last saw them ?  A. I can't remember.  Q. You did a pretty large business ?  A. I know that.  Q. How many thousands of dollars worth of cattle do you suppose you shipped, in which you were interested, directly or indirectly; during the year 1889 ?  A. I can't remember that; the bookkeeper knows that ; he can tell you.  Q. I thought you said he was dead ?  A. Well, I know, but he knew it at the time.  *  *  *  Q. You can't seri-- ously mean that you don't remember whether there was one book or six books which covered the enormous shipments· which you, the biggest shipper in New York, made ?  A. I can't remember.  Q. Did you ever see, yourself, any page or any book which recorded or purported to record any of your transactions in cattle during the year 1889 ?  A. No.  Q. Do you know anybody that ever did, except the bookkeeper whom you saw buried.  A. No ; I bought a house about two years ago, and I kept my books up at the house, and then we moved out, and the books didn't come down, and the books were destroyed ; they didn't come to the office, because we didn't have any safe.  We bought a new safe down here.  He (the bookkeeper) always kept those books in his power.  I myself am no bookkeeper.  Two years ago I bought a house and the books were left there, and we bought a safe down here; and they commenced with new books.  Q. He claimed your books as his own property ?  A. Yes.  Q. And you didn't make any objection to his claiming your books as his own property ?  A. No, I always thought he was a straightforward man."

The defendant, evidently with the idea that plaintiff's bank

account and checks would furnish evidence of payments to other lines for the shipment of cattle, inquired of him in what banks he kept his accounts for the year 1889. With what success the following questions and answers which fairly measure it will disclose: "Q. Did you keep more than one bank account during the year 1889? A. I can't remember; I kept one; I can't tell you; we have got two bank accounts; I don't know where we generally put the money in; I can't remember exactly. I didn't draw checks, I only signed them. Q. Can you tell this jury the name of any bank in which you kept an account and upon which you were in the habit of drawing checks or signing checks during the year 1889? A. I can't remember them all. Q. Can you remember the name of any bank in which you ever kept an account? A. I kept an account in the Chemical Bank. Q. Was it not in the Chemical Bank that you kept an account during the year 1889? A. I can't remember that."

It was, at least, quite remarkable that the plaintiff, who was the largest shipper of live cattle from the port of New York, and who during the year 1889 shipped between 60,000 and 70,000 head of cattle from that port to Liverpool, London, Glasgow and Hull, should within a short time thereafter permit the books showing all these transactions to be lost or destroyed under the circumstances testified to by him.

The care which he says he took of them was not such as would ordinarily be expected of a reasonably prudent man engaged in business of such magnitude. Clearly, the jury should have been permitted to say, in view of the character of his answers to defendant's inquiries on cross-examination, of which we have given specimens merely, whether they believed his testimony in such respect. And if the conclusion should have been reached that his testimony in that regard was untrue they would have been at liberty to disregard the rest of his evidence.

In addition, the defendants produced two witnesses who were shipping agents of other lines, who testified that in the year 1889 they had seen plaintiff's foreman, Mr. Hirsch, on several occasions superintending the loading of cattle on boats belonging to their lines.

In view of the general rule which obtains when the testimony of a party is wholly uncorroborated, coupled with the improbability of

many of the plaintiff's statements, the defendants were clearly entitled to have the jury pass upon his credibility. It was for them to say, after weighing the entire testimony in the light of the witness' interest in the result, whether they believed that he had met the burden resting upon him of establishing full performance of the contract on his part.

The judgment should be reversed, with costs to the appellant to abide the event.

VAN BRUNT, P. J., concurred.

FOLLETT, J. :

The circumstances disclosed by the record made the credibility of the plaintiff a question for the jury, and the court erred in directing a verdict; but I am not prepared to hold that the credibility of a party must, in all cases, be submitted to the jury. In case the testimony of a party is wholly uncontradicted, is not improbable on its face and there is no circumstance which tends to discredit the credibility of a party or the testimony given, the court may direct a verdict based on such testimony. (*Lomer* v. *Meeker*, 25 N. Y. 361; *Kelly* v. *Burroughs*, 102 id. 93.)

I do not understand that the Court of Appeals has laid down as a general rule that in all cases the credibility of a party or of a witness interested in the event of the action must be submitted to the jury, but in the particular cases considered it was held that the credibility of the party or of the interested witness should have been submitted to the jury.

Judgment reversed, with costs to the appellant to abide the event.