Clearwater, J.
The petitioner, an .insolvent debtor, seeks to be discharged from his debts, under the provisions of article 1. tit. 1, of chapter 17, of the Code of Civil Procedure, sections 2149 to 2187, inclusive, commonly known as the “ Two-Thirds Act.” The discharge is opposed by creditors whose claims aggregate $138,427.31, upon the grounds, among others : First, that the insolvent, at the time of presenting his petition, was not a resident . ot the county of Ulster ; second, that he did not, at the time of filing his petition, present consents executed by creditors, as re *353 quired by the act; third, that he has been guilty of such misconduct relative to matters involved as should bar his discharge; fourth, that the petition and the proceedings are not in accord with the provisions of the statute, in that they are faulty, both in substance and in form.
In support of this last contention so many objections have been urged that their mere enumeration would occupy almost as much space as is ordinarily devoted to an opinion, and, while it must be conceded that in some respects the proceedings upon the part of the petitioner are slightly original and inartificial, the view taken of the merits of the application makes is unnecessary to discuss them at length. It appears from the evidence, which is voluminous, if not exhaustive, that the petitioner, in the year 1884, was the president of the Bankers’ & Merchants’ Telegraph Company, a corporation having its principal place of business in the city of Eew York; that he was also interested in so-called “ financial operations ” in Wall street, and was largely indebted to various banks, bankers, brokers, and trust companies; that on the 15th day of May of that year he failed, and executed a general assignment for the benefit of his creditors, his indebtedness at that time being stated at $2,633,895.37, and his assets of the nominal value of $3,848,932.06. This assignment was subsequently adjudged to be void, and was set aside in an action brought for that purpose, it appearing that the result, if not the purpose of that suit, was to vest the title of such assets as:- he did have in his wife. It is claimed here that the assignment and the action were so collusive and tainted with fraud as to bar his discharge in this proceeding. The statute provides that the application for the discharge of an insolvent debtor must be addressed to -the county clerk of the county in which the insolvent resides (Code Civ. Proc. § 2150); that the insolvent must annex to his petition written instruments, executed by his creditors residing within the United States, having debts owing to them in good faith, then or thereafter to become due, which amount to not less than two-thirds of all the debts owing by him to creditors residing within the United States (Id. § 2152) ; and that the court shall grant the discharge when it satisfactorily appears, among the other things required by the statute, that the petitioner is justly and truly indebted to the consenting creditors in sums which amount in the aggregate to two-thirds of all his debts as hereinbefore specified (Id. § 2174). It would seem, therefore, as conditions precedent to the petitioner’s discharge, that.he must affirmatively establish (1) that at the time of presenting his petition he was a resident of the county of Ulster ; (2) that creditors having debts owing them in good faith amounting to not less than two-thirds of all the debts owing by him to creditors in this country shall, at the time of the filing af the petition, consent to his discharge ; (3) that he'is justly and truly indebted to the consenting creditors in a sum which amounts in the aggregate to two-thirds of all his debts. It is claimed by the insolvent that his debts now amount to $2,442,073.84, that creditors whose claims aggregate $2,303,646.53, consent to his discharge. *354 and that he has assets to the amount of $187.62 applicable to the payment of this indebtedness. The nonconsenting creditors, upon the other hand, claim that the true amount of the insolvent’s indebtedness exceeds three millions of dollars, and that the consenting creditors do not truthfully represent, within many hundreds of thousands of dollars, two-thirds of that sum.
As to the first point, it is well settled that in all cases where a, statute prescribes residence as a qualification for the enjoyment of a privilege or the exercise of a franchise, the word “residence" is equivalent to “place of domicile" of the person who claims its benefit. People v. Platt, 117 N. Y. 167; 27 St. Rep. 149; Silvey v. Lindsay, 107 N. Y. 55, 61; 11 St. Rep. 185; Jac. Domicile, §§ 72, 75, 86, 92, 114, 125, 136, 181, 310, 393, 396, 435; De Bonneval v. De Bonneval, 1 Curt. Ecc. 856, 864; Jopp v. Wood, 2 De Gex, J. & S. 326; State v. Grizzard, 89 N. C. 115, 120; State v. Aldrich, 14 R. I. 171; Roberts v. Cannon, 4 Dev. & B. 256, 269. “Domicile" is succently and accurately defined by a scholarly writer as follows: “In a legal sense, that is propeily the domicile of a person where he has his true, fixed, permanent home, and principal establishment, and to which whenever he is absent he has the intention of returning." Story, Confl. Law (Ed. 1846) c 3. p. 31. See, also, Burrill, Law Diet.; 5 Am. & Eng. Enc. Law. p. 857; and the Standard, Worcester, Webster, and Stormonth Dictionaries. Whatever be the doctrine of the civil law. it has uniformly been held to be the rule of the common ltyv that that place is a mar/s domicile which is his home; that it will be presumed so to continue until a new one is acquired; that it is in no way affected by a temporary residence els where; and that, to effect a change, there must not only be a change of residence, but an intention to abandon the former domicile,accompanied by an actual abandonment, with the intention not to return, and the taking up of a residence in another place, with the intention of staying there permanently. Depuy v. Wurtz, 53 N. Y. 556; Frost v. Bisbin, 19 Wend. 11; Von Hoffman v. Ward, 4 Redf. Sur. 244; Bartlett v. City of New York, 5 Sandf. 44; Graham v. Public Administrator, 4 Bradf. Sur. 127; De Meli v. De Meli, 67 How. Pr. 20,—apparently settle the rule in this state, which, however, is not different from that held elsewhere, where the common law prevails. The Lauderdale Peerage, 10 App. Cas. 692, 758; Gillis v. Gillis, 8 Ir. R. Eq. 597; Capdeviellev. Capdevielle, 21 Law T. (N. S.) 660; Hodgson v. De Beauchesne, 12 Moore, P. C. 285; Munro v. Munro, 7 Clark & F. 842. Did, then, within this rule, the petitioner have a legal residence in the county of Ulster at the time of filing his petition in this court, on the 7th day of August, 1893? It appears from the evidence that at that time, and for some years, he had been a member of the Peekamose Fishing Club, an organization then composed of four members, owning many acres of mountain land, and having an extensive fishing preserve on the headquarters of the Rondout, at the foot of the Peekamose Mountain, in a wild and unfrequented part of the Catskill Mountains, but within the territorial limits of the town of Denning, in this county. Its purpose is the protection, increase, and capture of brook trout, and the promotion of social intercourse *355 and rational amusement among its members. There is upon the grounds a clubhouse, divided into nine bed rooms, a dining room, and a kitchen, having a frontage of 38 and a depth of 25 feet, with two small extentions in the rear. It is constructed in part of lumber, in part logs, and is principally used during the summer months. The constitution and by-laws of the club provide that a room in the clubhouse shall be assigned to each member, and that the privilege of the clubhouse may be extended to the families of members. The petitioner’s family consists of his wife, her mother, a daughter, a son, and himself. The other members of the club, with their families, visit the clubhouse from time to time, and are assigned rooms as provided by the by laws. All the members, when at the clubhouse, have their food cooked in common, and eat together in the club dining room, being waited upon by such servants as the members take with them to the mountains, there being no clubhouse servants. The clubhouse is some distance removed from any of the mountain settlements, in fact from any human habitation; the nearest hamlet on the east being Watson’s Hollow, four or five miles distant, and there being a single mountain cabin at Bull Bun, on the Bondout, about four miles to the westward, while the wilderness to the southwestern Catskills stretches in unbroken solitude for miles to the north and south. There are, of course, no church, no schools, no neighbors, and no society other than that consisting of the members of the club, their families, and guests. The petitioner and his family for some years have spent the summer, and occasionally the late spring and early autumm, at this place, with such other members of the club and their families as went there. The residue of the year has been passed at Elizabeth, in the state of Hew Jersey, where they occupy a house, the title to which is vested in the petitioner’s wife. This house is about forty feet in front, is two stories in height, with the ordinary mansard roof, and has the usual rooms of a city dwelling of that class. It is occupied solely by the petitioner, his family and their servants, and is fully furnished with the furniture owned by the petitioner during the years of affluence which preceded his failure. For some years prior to living in this house the petitioner and his family occupied another dwelling at Elizabeth, of much the same character, the value of which can to some extent be estimated from the fact that'the Equitable Life Assurance Society of Hew York loaned $20,000 upon it. The relatives of the petitioner and of his wife live at Elizabeth, and his wife and children are connected with a church and Sunday school and some of the social organizations of that city. It is to Elizabeth they have always annually returned when the approached of winter deprives the atmosphere of the Catskills of that balsamic softness for which the region is noted. As the petitioner swore in support of this plication that he had been a resident of Ulster county for the last fifteen years, it is claimed by the learned counsel who represent him that the court is precluded by that testimony from finding otherwise. This contention can, however, hardly be said to be well founded, in view of the fact that he is an interested party, it having always been held since the passage of the act permitting par *356 ties in interest to testify in their own behalf that, even though their testimony be uncontradieted by other witnesses, yet their interest in the event creates such a question as to credibility as to justify the court in disregarding it, if all the evidence in the case requires its rejection. Govin v. De Miranda, 140 N. Y. 662-666; 55 St. Rep. 840; Canajoharie Nat. Bank v. Diefendorf, 123 N. Y. 191-200; 33 St. Rep. 389; Joy v. Diefendorf, 130 N. Y. 6-9; 40 St. Rep. 491; Honegger v. Weitstein, 94 N. Y. 252-261; Wohlfahrt v. Beckerl, 92 N. Y. 490-497; Elwood v. Telegraph Co., 45 Id. 549; Goldsmith v. Coverly, 75 Hun, 48 ; 56 St. Rep. 857. The strength of the insolvent’s testimony is, however, somewhat lessened by the following admitted facts: In the general assignment executed by him in 1884 he states that he is a resident of the city of New York. In the action brought to set aside that assignment it was by his procurement alleged and adjudged that in December, 1885, he was a resident of that city. In a deed executed by him at Elizabeth in October, 1892, to Josiah W. Went-worth, one of his fellow members in the Peekamose Fishing Club, and conveying an interest in land in Ulster county, he describes himself as being a resident of Elizabeth. In a deed executed by his procurement in February, 1893, to his wife, she is described as residing at Elizabeth. During the last ten years, when away from home and registering at hotels, he has registered his residence as at Elizabeth ; never at Peekamose. In the testimony given by him in an action brought by one of the contesting creditors he testified that for the last ten years he has,resided in the cities New York and Elizabeth. And he testifies that, in event of this application being granted^ it is his intention once more to engage in business in Wall street, in the city of New York, which is but a few pilles distant from Elizabeth.
Under all these undisputed facts, it would hardly seem that even within the most elastic construction which the court is justified in giving to the terms “residence’’ and “domicile,” the petitioner can legally be said to had been a resident of Ulster county, at the time of filing this petition.
It is quite true that the two-thirds act is a remedial statute intended to accomplish a beneficent result, and should therefore be liberally construed. Also it is true that much power and discretion is vested in the court to which this application is addressed. But all discretion vested in courts and judges is judicial, and not arbitrary; and it is an abuse, not an exercise, of judicial discretion to permit the provisions of even a remedial statute to be enlarged to such an extent as to bring within its terms a class of cases expressly excluded by the legislature. Such a construction, in the end, produces results more harmful in their effect than the fancied wrong it improperly seeks to remedy. This conclusion renders an extended discussion of the remaining questions involved unnecessary, although it may not be amiss briefly to say that the evidence falls far short of satisfying me that the petitioner has either produced the consents of creditors required by the statute, or that he is justly and truly indebted to the creditors who have consented to the amount he and they claim. Upon the contrary, I am at a loss *357 to understand upon what view of the law an indebtedness to John B. Yale, one of such creditors, to the amount of $331,815.62, can justly and truly be said to exist, in view of Mr. Yale’s own testimony as to the facts out of which it is claimed to have arisen. The claim of John R. Hageman, another consenting creditor, to the amount of $171,212.78, does not appear upon the schedule of the insolvent’:: creditors filed with his general assignment in 1884, and the debt' now claimed to be due is also claimed to have matured before that time. While this omission could not of course, prejudice the creditor, who was not consulted regarding the preparation of those schedules, and whose testimony on this proceed-•was, I think, frankly and fairly given, yet its omission at that time is some evidence as to the view then taken by the insolvent of the transactions out of which it is now claimed the indebtedness arose. It would seem also that there were included in those schedules claims aggregating considerably over $1,000",000, not included in the schedules of the insolvent’s creditors now filed. It is urged that of those claims upwards of $777,000 have been absolutely, and upwards of $247,000 conditionally, released, but it is doubtful whether the authority to make the release executed by Russell Sage, the Third National Bank of the city of New York, and Hague & Harris for claims aggregating about $120,000 is sufficiently proven for the purpose of this application; and it is by no means clear that the claim of the Quebec Bank'for $48,817 is not within the statute. In fact, the marshaling of the alleged claims of the consenting creditors, the reasons assigned for the failure to include claims admitted once to exist and never paid, the insistence that the statute of limitations bars the consideration of claims of creditor.: to the amount of hundreds of thousands of dollars, who have not been afforded an opportunity to be heard in their own behalf, and an equally strenuous insistence that claims of friendly creditors, standing upon precisely the same legal footing, are not barred by that statute, is an attitude hardly calculated to produce an unduly favorable impression upon the mind of the court. It is unnecessary to discuss the allegation of collusion aud fraudulent intent to which much attention has been devoted by counsel upon both sides, as upon the whole case I am of the opinion that the decree prayed for should be refused, and an order may be entered denying the application and dismissing the proceeding upon the merits, with costs to the opposing creditors and against the petitioner.